# No. 22-30487

---

# In the United States Court of Appeals for the Fifth Circuit

---

Iris Calogero, On her own behalf and on behalf of all others similarly situated; Margie Nell Randolph, individually and on behalf of all others similarly situated,

Plaintiffs - Appellants

v.

Shows, Cali & Walsh, L.L.P., a Louisiana limited liability partnership; Mary Catherine Cali; John C. Walsh,

Defendants - Appellees

---

On Appeal from the United States District Court for the
Eastern District of Louisiana
2:18-CV-6709

---

## BRIEF FOR APPELLANTS

---

Margaret E. Woodward (La. 13677)
1229 N. Tonti Street
New Orleans, Louisiana 70119
Tel: (504) 301-4333
Fax: (504) 301-4365
mewno@aol.com
*APPEAL COUNSEL*

Jennifer C. Deasy (La. 31696)
JENNIFER C. DEASY, LLC
1100 Poydras Street, Suite 1500
New Orleans, Louisiana 70163
Tel: (504) 582-2300
Fax: (504) 582-2310
jd@jenniferdeasy.com

*Counsel for Plaintiffs-Appellants, Iris Calogero and Margie Nell Randolph*
*Additional Counsel Listed on Following Page*

Additional Counsel for Plaintiffs-Appellants,
<u>Iris Calogero and Margie Nell Randolph</u>:

SOUTHERN POVERTY LAW CENTER
Kirsten Anderson (Fla. 17179)
kirsten.anderson@splcenter.org
Tel: (334) 414-0760
Jamie Rush (Ga. 999887)
jamie.rush@splcenter.org
Tel: (404) 673-6523
Clara Potter (La.38377)
clara.potter@splcenter.org
Tel: (504) 352-2060
400 Washington Avenue
Montgomery, Alabama 36104
and
201 Saint Charles Avenue
New Orleans, Louisiana 70170

GESUND & PAILET, LLC
Keren E. Gesund (La. 34397)
3421 N. Causeway Blvd.
Suite 805
Metairie, Louisiana 70002
Tel: (702) 300-1180
Fax: (504) 265-9492
keren@gp-nola.com

O. Randolph Bragg (Ill. 6221983)
300 N. State Street
Suite 5320
Chicago, Illinois 60654
Tel: (708) 774-4022
randbragg1@gmail.com

## CERTIFICATE OF INTERESTED PERSONS

Undersigned counsel of record certifies that the following listed persons and entities described in Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal.

1. <u>Plaintiffs-Appellants</u>:
   Iris Calogero; Margie Nell Randolph

2. <u>Defendants-Appellees</u>:
   Shows, Cali & Walsh, L.L.P.; Mary Catherine Cali; John C. Walsh; their insurer: Argonaut Insurance Company

3. <u>Counsel for Plaintiffs-Appellants</u>:
   Margaret E. Woodward, Attorney at Law
   Jennifer C. Deasy/ Jennifer C. Deasy, LLC
   Keren E. Gesund/ Gesund & Pailet, LLC
   Rand Horwitz/ Horwitz, Horwitz & Assoc.
   Kirsten Anderson, Jamie Rush, Clara Potter/ Southern Poverty Law Center

4. <u>Counsel for Defendants-Appellees</u>:
   David S. Daly, Elliot M. Lonker, Allen J. Krouse, III, Suzanne Marie Risey/ Frilot, LLC

*s/ Margaret E. Woodward*

_____
Attorney of Record for Appellants,
Iris Calogero and Margie Nell Randolph

## STATEMENT REGARDING ORAL ARGUMENT

This is a class action under the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692, *et seq.*, returning to this Court for a second appeal following remand in 2020.[1]  The case affects not only consumer protection law; it also raises federalism issues in disaster relief funded by the federal government and administered by affected states.

Named Plaintiffs are elderly widows who each gratefully accepted federal assistance to rebuild their homes in the wake of Hurricane Katrina.  That assistance included federally-funded grants disbursed by the State of Louisiana pursuant to a Road Home Agreement, which outlined the obligations each grant recipient owed to both state and federal governments.  Many years later, each Plaintiff received a collection letter from Defendants, attorneys seeking to collect thousands of dollars for alleged "duplicate benefits" purportedly owed under the Stafford Act, 42 U.S.C. § 5121, *et seq.* Any funds collected would be allocated to federally-approved objectives or returned to the U.S. Treasury.  Both Plaintiffs disputed the debts, without resolution.

---

[1] *Calogero v. Shows, Cali & Walsh, L.L.P.*, 970 F.3d 576 (5th Cir. 2020) (holding that alleged debts arising from monetary grants conditioned on performance obligations are subject to FDCPA protection, thus reversing 12(b)(6) dismissal).

Ultimately, one signed a promissory note and makes monthly payments she can ill afford; the other filed the instant suit.

Two of Plaintiffs' four FDCPA claims involve determination of whether collection of these debts is time-barred by federal or state law. The Louisiana prescriptive period applied by the lower court (ten years under Louisiana Civil Code Article 3499) is longer than the relevant federal statute of limitations (six years under 28 U.S.C. § 2415). However, the periods of other jurisdictions are shorter – only three years in some states. If the lower court's decision stands, this variation means future disaster victims nationwide will be treated differently, with longer or shorter exposure to debt collection under the Stafford Act depending on their state of residence. It also means the federal government could be constrained by disparate, short deadlines to recoup duplicate benefits – *even for dollars appropriated by the same congressional bill in response to the same disaster*. Floods, wildfires, pandemics, and the like can – often do – cross state lines. Thus, Plaintiffs urge application of the federal period to provide a uniform statute of limitations, thereby ensuring fairness and manageability while protecting the federal fisc as required by the Stafford Act.

The first appeal remanded this matter to allow investigation into the federal government's involvement in Louisiana's administration of its Katrina-relief funds. The ensuing discovery to unearth the relationship between the sovereigns, and also between the State of Louisiana and its several contractors, including Defendants, has been fact-intensive. Given the complexity of the federal grant and its administration by Louisiana and its contractors, as well as the enormity of the record detailing their interlocking roles, this Court may welcome the opportunity to question counsel about who did what, when, and why.

Plaintiffs' other claims also involve important issues:

o Should this Circuit adopt the "materiality standard" used in some other Circuits to determine whether a debt collector's means are false, deceptive, or misleading in violation of the FDCPA; and, if so, did the lower court err in concluding that the omissions, ambiguities, and misstatements in Defendants' letters were "immaterial" and thus not violative of the FDCPA;

o May a court grant summary judgment *sua sponte* on the basis of hypothetical fraud – a ground that was unpled, undefended, unproven, and *non-existent* here.

Additional issues presented by this case are listed on p. 2, *infra*.

    As in the first appeal, argued on March 5, 2020, undersigned counsel believes that oral argument will help inform the Court's decisional process on the important issues presented by this case.

# TABLE OF CONTENTS

Certificate of Interested Persons.....................................................i

Statement Regarding Oral Argument.......................................ii

Table of Authorities.................................................................x

Statement of Jurisdiction .......................................................1

Issues Presented ....................................................................2

Statement of the Case............................................................3

    A. Factual Background........................................................3

        August 2005: Hurricane Katrina devastates the Gulf Coast..........3

        December 2005: Congress appropriates billions to HUD for CDBG Grants to affected states. ...............................................5

        2006-2007: Louisiana proposes "Road Home Program" to HUD; hires contractors to implement program upon approval.................6

        Summer 2007: Mrs. Calogero and Mrs. Randolph sign Road Home Agreements and receive grants. .....................................8

        2007-2018: Louisiana takes steps to comply with federal requirements, including recapture of duplicate benefits. ...............9

        2017-2018: Defendants dun Plaintiffs for alleged breach of Road Home obligations..........................................................14

    B. Procedural History.......................................................17

Summary of the Argument ....................................................19

Argument ................................................................................ 24

I.    Summary judgment is reviewed *de novo*. ..................................... 24

II.   The district court misconstrued the FDCPA. ........................... 25

    A. An FDCPA claim challenges the debt collector's *practices*, not
    the alleged debt. ...................................................................... 25

    B. This Court evaluates an FDCPA claim from the objective
    perspective of "an unsophisticated consumer" – not according
    to "materiality" of the challenged conduct............................... 26

    C. Plaintiffs charge Defendants with violating §1692e and
    §1692f – not §1692g – of the FDCPA.. ..................................... 28

III.  The district court erred in dismissing Plaintiffs' first claim
    regarding Defendants' failure to itemize the alleged debts .......... 29

    A. The FDCPA requires that collection letters fairly inform the
    unsophisticated consumer.......................................................... 29

    B. The district court's new "rule" departs from *Fields* and the
    FDCPA ....................................................................................... 32

    C. The district court conflated §1692e and §1692f ...................... 45

    D. The district court misapplied the materiality standard........... 46

    E. Defendants' non-itemized dunning letters violate the FDCPA
    under any standard .................................................................... 49

IV.   The district court erred in dismissing Plaintiffs' second claim
    regarding Defendants' threat of legal action on time-barred claims.
    .................................................................................................. 53

    A. Misrepresenting the judicial enforceability of debts violates the
    FDCPA ...................................................................................... 55

B. In the first appeal, this Court declined to rule on which time-bar applies to Defendants' collection activities because the factual record was not yet developed. ......................................55

C. On remand, the district court improperly relied on the factual record of another proceeding to select Louisiana's ten-year period. ..................................................................................57

D. The facts of record here establish the federal government's interest in duplicate benefit debt, which compels application of a federal limitations period. ......................................................62

E. The six-year federal statute of limitations, 28 U.S.C. § 2415, preempts state periods here. ......................................................72

F. If Louisiana law governs, then Article 1564's five-year prescriptive period for non-performance of conditions on an onerous donation applies to Plaintiffs' grants. ........................76

G. Regardless of which time-bar applies here, that period began to run upon breach of the Road Home agreement. ......................79

H. Plaintiffs' debts prescribed before Defendants' collection actions.. ..................................................................................82

V.  The district court erred in dismissing Plaintiffs' third claim by improperly finding that Defendants had a right to threaten recovery of attorneys' fees from Plaintiffs. ..................................84

A. Defendants relied on contractual authorization – only – for fee-shifting.... .............................................................................86

B. The district court misinterpreted the Road Home Agreement. ..................................................................................................88

C. The district court impermissibly adopted, *sua sponte*, its own ground for summary judgment: hypothetical fraud................96

VI.   The district court erred in dismissing Plaintiffs' fourth claim, relating to Defendants' inducement to revive time-barred claims. ................................................................................... 101

VII.  Class certification should be granted. ........................................ 104

Conclusion and Relief Requested ........................................................ 105

Certificates ......................................................................................... 108

# Addendum

FDCPA, 15 U.S.C. §§ 1692e, 1692f, 1692g ................................................. I

The Stafford Act, 42 U.S.C. § 5155 .......................................................... II

Statutes of Limitation .......................................................................... III

A. Federal
   28 U.S.C. § 2415

B. Louisiana
   LA. CIV. CODE ANN. art. 1564

   LA. CIV. CODE ANN. art. 3499

C. Other states' limitation periods for breach of contract
   ALA. CODE § 6-2-34

   FLA. STAT. ANN. § 95.011

   GA. CODE ANN. § 9-3-24

   MISS. CODE ANN. § 15-1-49

   TEX. CIV. PRAC. & REM. CODE § 16.004

# TABLE OF AUTHORITIES

## Federal Authorities

### Rules & Statutes

FED. R. CIV. P. 23 ................................................................................. 105

FED. R. CIV. P. 56 .................................................. *passim*, especially p. 24

FED. R. EVID. 804 ................................................................................. 60

Fair Debt Collection Practices Act (FDCPA),
15 U.S.C. § 1692 *et seq.* .................................................................. *passim*
      § 1692e ................................................... *reproduced in Addendum*
      § 1692f .................................................... *reproduced in Addendum*

31 U.S.C. § 1291 ................................................................................. 1

28 U.S.C. § 2415 ........................................ iii, 53-84, 101-04, *Addendum*

31 U.S.C. § 3701 ................................................................................. 65

Robert T. Stafford Disaster Relief and Emergency Act,
42 U.S.C. § 5121, *et seq.* .............................................................. *passim*
      § 5155(a), (c) ........................................... *reproduced in Addendum*

Department of Defense, Emergency Supplemental Appropriations to
Address Hurricanes in the Gulf of Mexico and Pandemic Influenza Act,
Pub. L. 109-148, 119 Stat. 2779 (2006) ...................................... 5

Emergency Supplemental Appropriations Act for Defense, The Global
War on Terror, and Hurricane Recovery,
Pub. L. 109-234, 120 Stat. 472 (2006) ....................................... 5

An Act Making Appropriations for the Department of Defense for the
fiscal year ending September 30, 2008, and for other purposes,
Pub. L. 110-116, 121 Stat. 1343 (2007) ..................................... 5

# Regulations & Notices

*Clarification of Duplication of Benefits Requirements Under the Stafford Act for Community Development Block Grant (CDBG) Disaster Recovery Grantees,* Notice of the U.S. Department of Housing and Urban Development,
76 Fed. Reg. 71061 (Nov. 16, 2011) ........................................ 5, 12, 36, 66

# Cases

*A.A. v. Northside Indep. Sch. Dist.,*
951 F.3d 678 (5th Cir. 2020) .................................................. 24

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ........................................................ 24, 35

*Arias v. Gutman, Mintz, Baker & Sonnenfeldt, LLP,*
875 F.3d 128 (2d Cir. 2017) ..................................................... 45

*Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.,*
111 F.3d 1322 (7th Cir. 1997) ............................................... 25

*Battle v. Mem'l Hosp. at Gulfport,*
228 F.3d 544 (5th Cir. 2000) ................................................. 60

*Baye v. Midland Credit Mgmt., Inc.,*
No. 17-4789, 2017 WL 4918998 (E.D. La. Oct. 31, 2017) .................... 102

*Bradley v. Franklin Collection Serv., Inc.,*
No. 10-cv-01537, 2011 WL 13134961 (N.D. Ala. Mar. 24, 2011) ........... 31

*Castro v. Collecto, Inc.,*
634 F.3d 779 (5th Cir. 2011) ............................................... 72-73

*Clearfield Trust Co. v. U.S.,*
318 U.S. 363 (1943) ......................................................... 75

*Copeland v. Merrill Lynch & Co.*,
47 F.3d 1415 (5th Cir. 1995) ................................................................. 59

*D'Onofrio v. Vacation Publ'ns, Inc.*,
888 F.3d 197 (5th Cir. 2018) ..................................................... 24, 97-98

*Dartez v. Fibreboard Corp.*,
765 F.2d 456 (5th Cir. 1985) ................................................................. 60

*Daugherty v. Convergent Outsourcing, Inc.*,
836 F.3d 507 (5th Cir. 2016) ..................................................... 29, 53, 85

*Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*,
530 F.3d 395 (5th Cir. 2008) ......................................................... 24, 35

*Deporter v. Credit Bureau of Carbon Cnty.*,
No. 14-cv-00882, 2015 WL 1932336 (D. Colo. Apr. 28, 2015) ............... 31

*Dickinson v. Auto Ctr. Mfg. Co.*,
733 F.2d 1092 (5th Cir. 1983) ................................................................. 1

*Dixson v. U.S.*,
465 U.S. 482 (1984) ....................................................................... 69-70

*Dougherty v. Wells Fargo Home Loans, Inc.*,
425 F. Supp. 2d 599 (E.D. Pa. 2006) ..................................................... 32

*Fed. Ins. Co. v. Cmty. State Bank*,
905 F.2d 112 (5th Cir. 1990) ................................................................. 93

*Fields v. Wilber Law Firm, P.C.*,
383 F.3d 562 (7th Cir. 2004) ......................................... 29-33, 46, 49, 51

*Flinn v. Michael J. Scott, P.C.*,
No. 14-0701, 2014 WL 11460395 (N.D. Tex. Dec. 12, 2014) ........... 101-02

*Foster v. DBS Collection Agency*,
463 F. Supp. 2d 783 (S.D. Ohio 2006) ................................................... 85

*Gomez v. Niemann & Heyer, L.L.P.*,
No. 16-cv-119, 2016 WL 3562148 (W.D. Tex. June 24, 2016) .... 26-27, 31

*Gonzales v. Arrow Fin. Servs., LLC*,
660 F.3d 1055 (9th Cir. 2011) ................................................... 34, 47, 99

*Goodrick v. Cavalry Portfolio Servs., LLC*,
No. 12-1822, 2013 WL 4419321 (D. Ariz. Aug. 19, 2013) ............... 33, 43

*Goswami v. Am. Collections Enter., Inc.*,
377 F.3d 488 (5th Cir. 2004) ........................................................ 24, 35

*Grden v. Leiken Ingber & Winters, PC*,
643 F.3d 169 (6th Cir. 2011) .............................................................. 102

*Grubb v. Green Tree Servicing, LLC*,
No. 13-07421, 2014 WL 3696126 (D.N.J. July 24, 2014) ...................... 31

*Hackler v. Tolteca Enter., Inc.*,
No. 18-cv-00911, 2019 WL 6727874 (W.D. Tex. Dec. 11, 2019) ........... 32

*Hahn v. Triumph P'ships, LLC*,
557 F.3d 755 (7th Cir. 2009) ........................................................ 33, 39

*Hall v. Phenix Investigations, Inc.*,
642 F. App'x. 402 (5th Cir. 2016) ........................................................ 26

*Hepsen v. J.C. Christensen & Assocs., Inc.*,
No. 07-cv-1935, 2009 WL 3064865 (M.D. Fla. Sept. 22, 2009) ............. 28

*Heredia v. Cap. Mgmt. Servs., L.P.*,
942 F.3d 811 (7th Cir. 2019) ...................................................... 34, 47, 99

*Houser v. LTD Fin. Servs., LP*,
512 F. Supp. 3d 746 (S.D. Tex. 2021) .................................................. 45

*Hulsey v. U.S. Air, Inc.*,
868 F.2d 1423 (5th Cir. 1989) ...................................................... 24, 35

*In re Deepwater Horizon*,
739 F.3d 790 (5th Cir. 2014) ............................................................ 104

*In re Katrina Canal Breaches Litig.*,
613 F.3d 504 (5th Cir. 2010) ............................................................ 95

*Ishee v. Fed. Nat'l Mortg. Ass'n*,
641 F. App'x. 438 (5th Cir. 2016) ...................................................... 82

*Kolbasyuk v. Cap. Mgmt. Servs., LP*,
918 F.3d 236 (2d Cir. 2019) ........................................................ 34, 44

*LaMonaca v. First States Fin. Servs. Corp.*,
No. 18-11829, 2019 WL 2636656 (D.N.J. June 27, 2019) .................... 31

*Landry's, Inc. v. Ins. Co. of the State of Pa.*,
4 F.4th 366 (5th Cir. 2021) .............................................................. 94

*Leatherman v. Tarrant Co. Narcotics Intelligence & Coordination Unit*,
28 F.3d 1388 (5th Cir. 1994) ............................................................ 97

*Lox v. CDA, Ltd.*,
689 F.3d 818 (7th Cir. 2012) .................................................. 85-86, 99

*Manning v. Utils. Mut. Ins. Co.*,
254 F.3d 387 (2d Cir. 2001) .............................................................. 72

*Manuel v. Merchants & Prof'l Bureau, Inc.*,
956 F.3d 822 (5th Cir. 2020) ................................ 25, 29, 45, 53, 83, 102

*McCartney v. First City Bank*,
970 F.2d 45 (5th Cir. 1992) ........................................................ 25, 35

*McCullough v. Johnson, Rodenburg & Lauinger, LLC*,
637 F.3d 939 (9th Cir. 2011) ............................................................ 85

*McKenzie v. E.A. Uffman and Assoc., Inc.*,
119 F.3d 358 (5th Cir. 1997) ............................................................ 27

*McMahon v. LVNV Funding, LLC,*
744 F.3d 1010 (7th Cir. 2014) ............................................ 53-54, 85, 102

*Melba Terry Shelton Succession v. Encompass Indem. Co.,*
60 F. Supp. 3d 722 (W.D. La. 2014) ........................................ 93

*Meraz v. M. Susan Rice, P.C.,*
No. 09-CA-138, 2009 WL 10669232 (W.D. Tex. May 15, 2009) ............ 31

*Merchants Nat. Bank & Tr. Co. of Indianapolis v. Smith, Hinchman &*
*Grylls Assocs., Inc.,*
876 F.2d 1202 (5th Cir. 1989) ............................................ 77

*Meyer v. Fay Servicing, LLC,*
385 F. Supp. 3d 1235 (M.D. Fla. 2019) .................................... 31

*Miller v. McCalla, Raymer, Padrick, Cobb, Nichols & Clark, L.L.C.,*
214 F.3d 872 (7th Cir. 2000) ........................................... 32, 52

*Moran v. Greene & Cooper Att'ys LLP,*
43 F. Supp. 3d 907 (S.D. Ind. 2014) ..................................... 43-44

*Napoleon v. Shows, Cali & Walsh, LLP,*
573 F. Supp. 3d 1063 (E.D. La. 2021) ................................... 58-61

*Naquin v. Elevating Boats, L.L.C.,*
817 F.3d 235 (5th Cir. 2016) ............................................ 90

*Pederson v. Louisiana State Univ.,*
213 F.3d 858 (5th Cir. 2000) ........................................... 105

*Perry v. Stewart Title Co.,*
756 F.2d 1197 (5th Cir. 1985) ........................................... 62

*Prytania Park Hotel, Ltd. v. Gen. Star Indem. Co.,*
179 F.3d 169 (5th Cir. 1999) ............................................ 1

*Salinas v. R.A. Rogers, Inc.*,
No. 18-cv-733, 2019 WL 2465325, (W.D. Tex. June 13, 2019), *aff'd on other grounds*, 952 F.3d 680 (5th Cir. 2020) ............................. 27, 28, 49

*Sheriff v. Gillie*,
578 U.S. 317 (2016) ............................................................... 27

*Sibley v. Firstcollect, Inc.*,
913 F. Supp. 469 (M.D. La. 1995) ........................................ 26

*Smith v. Am. Rev. Corp.*,
No. 04-cv-0199, 2005 WL 1162906 (N.D. Ind. May 16, 2005) ............... 31

*Taubenfliegel v. EGS Fin. Care, Inc.*,
No. 18-cv-1962, 2018 WL 3079697 (E.D.N.Y. June 21, 2018) ... 34, 42, 44

*Tepper v. Amos Fin., LLC*,
No. 15-cv-5834, 2017 WL 3446886 (E.D. Pa. Aug. 11, 2017) ................. 31

*Thomas v. N.A. Chase Manhattan Bank*,
1 F.3d 320 (5th Cir. 1993) .................................................... 82

*Tourgeman v. Collins Fin. Servs., Inc.*,
755 F.3d 1109 (9th Cir. 2014), *as amended on reh'g* (Oct. 31, 2014)
............................................................................... 32, 52

*United States v. Orleans*,
425 U.S. 807 (1976) ............................................................. 61

*United States v. Thornburg*,
82 F.3d 886 (9th Cir. 1996) ............................................... 70-71

*Vogel v. McCarthy Burgess & Wolff, Inc.*,
No. 17-cv-6681, 2020 WL 6134987 (N.D. Ill. Oct. 19, 2020) ............ 40-41

*Wilson v. Trott*,
118 F. Supp. 3d 953 (E.D. Mich. 2015) ................................. 43

**Legislative Materials**

S. Rep. No. 1328, 89th Cong. 2d Sess. (1966) ..................................74-75

H.R. Rep. No. 1534, 89th Cong. 2d Sess. (1966) .............................74-75

S. Rep. No. 382, 95th Cong., 1st Sess. (1977) ........................................25

*Implementation of the Road Home Program Four Years After Hurricane Katrina: Field Hearing Before the House Committee on Financial Services*, 111th Cong., (Aug. 20, 2009) (statement of F. Tombar, Sr. Advisor, U.S. Department of Housing and Urban Development) ......... 11

**Louisiana Authorities**

**Legislation**

La. Civ. Code Ann. art. 1468..................................................................77

La. Civ. Code Ann. art. 1556..................................................................78

La. Civ. Code Ann. art. 1564................. 21, 56, 76-79, 83, 103, *Addendum*

La. Civ. Code Ann. art. 1854............................................................92-93

La. Civ. Code Ann. art. 2046 ................................................................ 91

La. Civ. Code Ann. art. 2053................................................................ 89

La. Civ. Code Ann. art. 3499......iii, 21, 56, 76-77, 83-84, 104, *Addendum*

La. Stat. Ann. § 22:46 ......................................................................... 92

La. Stat. Ann. § 49:663.1 ...................................................................... 66

## Supreme Court Rules

Louisiana Rules of Professional Conduct, Rule 4.2(a)........................ 103

## Jurisprudence

*Campo v. Correa,*
01-2707 (La. 6/21/02), 828 So. 2d 502 ................................................ 79-81

*DiMattia v. DiMattia,*
282 So. 2d 554 (La. App. 1 Cir. 1973) .................................................... 78

*Gray Ins. Co. v. Old Tyme Builders, Inc.,*
No. 03-1136 (La. App. 1 Cir. 4/2/04), 878 So. 2d 603 ............................ 93

*Howard v. Adm'rs of the Tulane Educ. Fund,*
07-2224 (La. 7/1/08), 986 So. 2d 47 ................................................... 77-78

*Maloney v. Oak Builders, Inc.,*
256 La. 85, 235 So. 2d 386 (La. 1970) ................................................... 86

*Martin v. Schwing Lumber & Shingle Co.,*
81 So. 2d 852 (La. 1955) ....................................................................... 82

*P.P. Williams & Co. v. Roach,*
12 La. App. 305, 125 So. 465 (1929) ................................................. 93-94

*Robinson v. Marks,*
211 La. 452, 30 So. 2d 200 (La. 1947) ................................................... 89

*Sullivan v. Sullivan,*
No. 42,923 (La. App. 2 Cir. 2/13/08), 976 So. 2d 329 ........................ 92-93

*Taylor v. Taylor,*
208 La. 1053, 24 So. 2d 74 (La. 1945) .................................................. 93

*Voinche v. Town of Marksville,*
50 So. 662 (La. 1909) ........................................................................... 78

## Legislative History

*Hearing before the Select Committee on Hurricane Recovery*,
2014 La. Sess. (March 6, 2014),
video available from Louisiana State Senate Archives, at:
https://senate.la.gov/s_video/videoarchive.asp?v=senate/2014/03/030614HURRICAN
E.wmv. .................................................................................................. 66

## Authorities of Other Jurisdictions

ALA. CODE § 6-2-34 .............................................................. 75, *Addendum*

FLA. STAT. ANN. § 95.011 ..................................................... 75, *Addendum*

GA. CODE ANN. § 9-3-24 ........................................................ 75, *Addendum*

MISS. CODE ANN. § 15-1-49 ............................................ 75-76, *Addendum*

TEX. CIV. PRAC. & REM. CODE § 16.004 ............................... 75, *Addendum*

## Other Authorities

BLACK'S LAW DICTIONARY (11th ed. 2019) ............................................. 92

ANTONIN SCALIA & BRYAN GARNER,
READING LAW: THE INTERPRETATION OF LEGAL TEXTS (2012) ................. 94

MARCEL PLANIOL, 3 TREATISE ON THE CIVIL LAW, Pt. 2, No. 2579 .......... 77

10A WRIGHT & MILLER, FED. PRAC. & PROC. § 2715 (4th ed.) .................. 1

## STATEMENT OF JURISDICTION

Plaintiffs Iris Calogero and Margie Nell Randolph (collectively, "Plaintiffs") appeal from the July 12, 2022 Order and Reasons granting summary judgment on motion of Defendants, Shows, Cali & Walsh, L.L.P., Mary Catherine Cali, and John C. Walsh (collectively, "Defendants"); and denying Plaintiffs' motions for partial summary judgment on each of their FDCPA claims as well as their motion for class certification, and further denying as moot their motion to strike one of Defendants' exhibits. Tab 4, RE-32, ROA.8466-8528. On that same date, Judgment was entered in favor of all Defendants dismissing all of Plaintiffs' claims against them, with prejudice. Tab 3, RE-30, ROA.8529. These rulings were entered by the Honorable Barry W. Ashe in the U.S. District Court for the Eastern District of Louisiana.  Plaintiffs appealed on August 10, 2022. Tab 2, RE-27, ROA.8530.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.[2]

---

[2] Judgment dismissing all claims with prejudice terminates the action and is thus a final judgment, into which all interlocutory rulings are "merged." *Dickinson v. Auto Ctr. Mfg. Co.*, 733 F.2d 1092, 1102 (5th Cir. 1983).  The grant and denial of cross-motions for summary judgment are both subject to this Court's "plenary review" on appeal. *Prytania Park Hotel, Ltd. v. Gen. Star Indem. Co.*, 179 F.3d 169, 183 (5th Cir. 1999); *see also* 10A WRIGHT & MILLER, FED. PRAC. & PROC. § 2715, n. 27 (4th ed.).

## ISSUES PRESENTED

1. Did Defendants' non-itemized dunning letters constitute a false, deceptive, or misleading representation of Plaintiffs' alleged debts, or constitute an unfair means to collect or attempt to collect a debt, in violation of the FDCPA?

2. Did Defendants' threats to take legal action violate the FDCPA by misrepresenting the judicial enforceability of Plaintiffs' debts allegedly incurred more than ten years prior to Defendants' dunning?

3. Did Defendants have a right to recover attorneys' fees in any collection action they might institute against Plaintiffs; and if not, did Defendants violate the FDCPA by threatening unauthorized fee-shifting in their collection letters?

4. Did Defendants violate the FDCPA by having Plaintiff Randolph sign a promissory note and make partial payment on a debt without disclosing that doing so could revive the time-barred claim?

5. Should class certification be granted?

## STATEMENT OF THE CASE

### A.    Factual Background

This action arises out of efforts to recapture federal grant funds allegedly overpaid to Louisiana homeowners in the aftermath of Hurricane Katrina. Years after Plaintiffs rebuilt their homes, Defendants attempted to collect these funds. Plaintiffs disputed the alleged debts, without resolution, and Defendants never pursued suit against them.

The instant action does not – cannot – address whether Plaintiffs owe the alleged debts because an FDCPA action addresses only collection *practices*. The debts here are disputed, but the facts surrounding Defendants' collection practices are not. The following timeline of the thirteen-year period between disaster and dunning informs Plaintiffs' FDCPA claims at bar.

### AUGUST 2005: HURRICANE KATRINA DEVASTATES THE GULF COAST.

On August 29, 2005, Hurricane Katrina roared ashore near the Louisiana-Mississippi border. More than a million people fled to escape the storm.  Many were under mandatory evacuation orders to do so; some orders extended for weeks, even months, because the storm's damage

prevented access to entire communities. New Orleans and surrounding parishes were devastated; the region's housing stock was decimated.

At the time, Mrs. Calogero was 70 years old, working as a secretary, and living in the Slidell, Louisiana home her late husband built with his own hands. ROA.6871. Mrs. Randolph, too, was in her 70's; she lived in the New Orleans home where she raised her family. ROA.6886.

Both Mrs. Calogero and Mrs. Randolph had homeowners' insurance from State Farm, which paid its insureds each $2,500 about a week after the storm – long before evacuation orders were lifted or any property damage assessment, much less insurance adjusting, could begin. ROA.6339-40, ¶¶25-26.

Upon subsequently discovering Katrina had severely damaged their homes, Mses. Calogero and Randolph each made insurance claims; Mrs. Calogero also applied for assistance from the Federal Emergency Management Agency (FEMA). Like many on the Gulf Coast, each found these funds were insufficient to fully repair their storm-ravaged homes, as they would later aver in applying for Road Home grants. ROA.2540, 2549.

## DECEMBER 2005: CONGRESS APPROPRIATES BILLIONS TO HUD FOR CDBG GRANTS TO AFFECTED STATES.

By year-end, Congress appropriated $11.6 billion to the U.S. Department of Housing and Urban Development's (HUD) Community Development Block Grant (CDBG) program to assist affected areas in five states.[3] Therein, Congress incorporated the following mandate of the Robert T. Stafford Disaster Relief and Emergency Act:

> That the Secretary [of HUD] shall establish procedures to prevent recipients from receiving any **duplication of benefits** and report quarterly to the Committees on Appropriations...

119 Stat. 2781 (emphasis supplied).[4]

Duplicate benefits are prohibited to ensure that federal disaster assistance serves only to supplement insurance and other forms of relief. A duplication occurs when assistance is provided by multiple sources for a cumulative amount that exceeds the total need for a particular purpose. 76 Fed. Reg. 71061 (Nov. 16, 2011). The Stafford Act provides that a

---

[3] Department of Defense, Emergency Supplemental Appropriations to Address Hurricanes in the Gulf of Mexico and Pandemic Influenza Act, Pub. L. 109-148, 119 Stat. 2779-81 (2006).

[4] This language was repeated in the supplemental appropriations bills for hurricane recovery. *See*, Pub. L. 109-234, 120 Stat. 472-73 (2006); Pub. L. 110-116, 121 Stat. 1343 (2007).

"person receiving Federal assistance for a major disaster or emergency shall be liable to the United States to the extent such assistance duplicates benefits available to the person from another source."   42 U.S.C. § 5155(c).

## 2006-2007: LOUISIANA PROPOSES "ROAD HOME PROGRAM" TO HUD; HIRES CONTRACTORS TO IMPLEMENT PROGRAM UPON APPROVAL.

Congress further provided that these HUD-CDBG funds would be "administered through an entity or entities designated by the Governor of each State." 119 Stat. 2780.  Each affected state submitted its proposal to HUD; Louisiana proposed its Road Home Program, to be managed by its Office of Community Development ("OCD") and the newly-created Louisiana Recovery Authority ("LRA").[5] The year-long proposal process was iterative, with HUD demanding multiple revisions to ensure Louisiana's compliance with federal requirements. One integral component was duplicate benefit recapture, which Louisiana ultimately incorporated, declaring: "this is a requirement imposed by federal

---

[5] The labels "OCD," "LRA," "Louisiana," and "the State" are used interchangeably herein.

regulations." ROA.6331, ¶5.c. HUD approved Louisiana's Road Home Program in May 2007. ROA.6344.

Louisiana outsourced administration of the newly-approved program to ICF International, Inc. ("ICF"), which handled individual grant applications, including interfacing with homeowners applying for HUD funds, entering all pertinent data, calculating award eligibility, and disbursing funds. ROA.7901, 8074-75. The grant formula calculated property damage from the storm and, to avoid duplicate benefits, subtracted any FEMA or insurance payments applicants had received for the same damage. ROA.6331, ¶5.b, ROA.6355.

Processing tens of thousands of applications required computer systems, which were purpose-built and adapted to meet OCD's obligations in administering the HUD funds. To that end, ICF subcontracted software company STR Grants, LLC (later GCR, Inc.) to design a database and construct a datafeed from FEMA and insurers. ROA.6946. Each data transmission was to identify potential duplicate payments subject to recoupment under the Stafford Act. ROA.6947, 8074-75. Once the feed was activated, FEMA and insurers used it to notify OCD of any payments made to individual homeowners. All data were

maintained in the "data-warehouse," as well as transferred to a user-interface called "eGrants," which OCD and its contractors used for administration of the Road Home Program.  ROA. 6945-50, 8088-98; *see also* Tab 6, RE-108, ROA.7837-39; Tab 7, RE-112, ROA.7840-41.

## SUMMER 2007: PLAINTIFFS SIGN ROAD HOME AGREEMENTS AND RECEIVE GRANTS.

Mses. Calogero and Randolph each sought Road Home grants. The application required them to disclose amounts of FEMA assistance and insurance proceeds related to their respective property damage. Each did so.[6]  Based on the formula, Mrs. Calogero received a Road Home grant in the amount of $33,393, which closed on May 11, 2007. Mrs. Randolph received a grant in the amount of $28,793, which closed on June 30, 2007. ¶¶8, 10 of ROA.6337, 7126.

Although disbursed by the State of Louisiana, each Road Home grant was awarded "from the United States of America." ROA.7721. At

---

[6] Plaintiff Randolph disclosed receipt of $7,630.90 from her insurer. ROA.6097. This amount does not include the $2,500 payment issued by State Farm immediately after Katrina's landfall.

Plaintiff Calogero disclosed receipt of $25,233, specifically: $14,733 from her insurer (exclusive of the $2,500 immediate post-storm payment) and, according to OCD's records, $10,500 from FEMA (the sum of two awards, $5,200 + $5,300). ROA.6094-95.

closing, Mses. Calogero and Randolph each executed a "Road Home Agreement," a suite of four form documents detailing their several obligations promised in exchange for the grants; breach of any one could result in demand for repayment by either the federal or state governments. *See*, Tab 5, RE-95, ROA.7721-33 (Calogero); *see also*, ROA.7734-45 (Randolph).

Mrs. Calogero and Mrs. Randolph each rebuilt their houses and returned home. ROA.6872, 7028.

## 2007-2018: LOUISIANA TAKES STEPS TO COMPLY WITH FEDERAL REQUIREMENTS, INCLUDING RECAPTURE OF DUPLICATE BENEFITS.

### a. Summer - Fall 2007: FEMA and State Farm notice OCD of potential duplicate benefit payments to Plaintiffs.

Not quite two months after grant issuance, FEMA reported its payment of $5,300 to Mrs. Calogero via OCD's datafeed; this report came into OCD's data warehouse on July 3, 2007. A few weeks later, on August 5, 2007, State Farm's report of additional payments to Mrs. Calogero went to the data warehouse. ROA.6849, 8096; Tab 8, RE-115, ROA.7814.

Just a few months later, by October 18, 2007, the State received notice from State Farm of its payments to Mrs. Randolph, likewise, the notice was transmitted via the State's new datafeed. ROA.6129, 8097-98.

**b. March 2008: OCD, through ICF, reviews Plaintiffs' grant files.**

OCD's database contained the dates on which the payments to Plaintiffs Calogero and Randolph had been made, by whom, and when; this information was accessible by simple query. ROA.6134. In March 2008, OCD, through ICF, made the query and reviewed both Plaintiffs' files, including the data received months earlier. Notation was made in eGrants that Mses. Calogero and Randolph had each received payments that had not been included in initial grant calculations. ROA.2441, 4838, 7324-25; *see also*, Tab 6, RE-109, ROA.7837, Tab 7, RE-113, ROA.7841. No further action was taken on these files for several years.

**c. 2009: HUD testifies to Congress about its ongoing oversight of Katrina disaster funds.**

Meanwhile, the federal government monitored the State's administration. HUD summarized its oversight in a hearing before Congress:

To assist the State of Louisiana in administering a recovery program of this size, HUD has implemented strong programmatic oversight and ongoing technical assistance measures, which are critical elements to ensure compliance.

\*\*\*

The Road Home Program has been heavily scrutinized as reflected in the State being audited over 52 times since the first supplemental [appropriation].

*Implementation of the Road Home Program Four Years After Hurricane Katrina: Field Hearing Before the House Committee on Financial Services*, 111th Cong. (2009) (statement of F. Tombar, U.S. Department of Housing and Urban Development).

As just one example, the federal inspector general determined that the State had disbursed grants to ineligible recipients, which resulted in the State's being required to return nearly $5 million to HUD. ROA.6351-53. The State was audited by HUD continually during the entire period of Road Home administration. ROA.1383, 1628, ¶¶30-31.

### d. 2009: Using federal funds, Louisiana retains Defendants to recapture duplicate benefits from grant recipients.

To meet its Stafford Act responsibilities, the State retained Defendant law firm Shows, Cali & Walsh, L.L.P. ("SCW") for collection services. The State's contract charged Defendants "to investigate…funds to be recovered due to misapplication or duplication of benefits and/or

breach of Road Home agreements" and "to pursue recovery on files where overpayment has been verified…and pursue litigation against grant recipients where appropriate." ROA.6333, 6679, 6682. The Louisiana Office of State Procurement certified this contract as: "100% FED HUD CDBG $...GRANT RECOVERY." ROA.6700.

Although not a party to the State-SCW contract, the federal government paid for Defendants' services and the software they used to track their work. ROA.6668, 6674-75. Further, the State-SCW contract authorized federal monitoring of Defendants' collection efforts. ROA.6690.

### e. 2011-15: HUD presses Louisiana – and other states – to hasten recapture.

HUD consistently focused on Louisiana's compliance with the Stafford Act.[7] Louisiana adopted a Memorandum of Understanding which acknowledged its obligation to recapture overpayments on behalf of the United States and described OCD as "the fiscal agent responsible to [HUD]" in all fiscal matters. Also, in response to HUD's concern about the slow pace of recapture, the State formally adopted a "Duplication of

---

[7] In fact, HUD was focused on *all* States with active CDBG disaster recovery grants. In 2011 it advised them that duplicate benefit funds should be recaptured upon discovery. 76 Fed. Reg. 71060.

Benefits Policy" in 2014. Still concerned, HUD imposed a 2015 deadline by which the State and HUD would agree to an "updated duplication of benefits policy." ROA.6333, 6355, 6365.

### f. 2016: Louisiana sues its contractor ICF for mismanagement that resulted in grant overpayments.

In 2016, the State sued its former contractor ICF for breach of contract, alleging mismanagement of award calculation and duplicate benefits that resulted in overpayments to thousands of grant recipients. The State seeks to recoup the total amount of overpayments from ICF; litigation is ongoing. ROA.6714, 7901-04.

### g. 2017-2018: HUD conducts on-site evaluations of Defendants

Meanwhile, in conjunction with its ongoing audits and as authorized by the OCD-SCW contract, HUD conducted an on-site review of Defendants' collection efforts in April 2017. Its ensuing Monitoring Report discussed Defendants' processes, noted concern over the timeline, and called for the State to update its recapture plan. ROA.6334, 6650-52, 6656-57.

The State renewed Defendants' contract, raising their compensation to avoid "myriad federal [sic]." ROA.6701. Defendant Cali testified that this statement meant the State might have "to repay the

entire grant" to the federal government if they failed to recapture duplicate benefits.  ROA.5972.

HUD met again with Defendants in 2018 to review their on-going collection efforts.  ROA.6335-36, 6663-65.

### h. Recaptured funds are returned to the U.S. Treasury or the HUD-CDBG grant account.

Ultimately, any funds recovered by Defendants were transferred to OCD and listed in their monthly reports to HUD. OCD then returned the funds to either the federal CDBG grant account for future spending in support of HUD's objectives, or to the U.S. Treasury. ROA.5979, 6337, 6667.

## 2017-2018: DEFENDANTS DUN PLAINTIFFS FOR ALLEGED BREACH OF ROAD HOME OBLIGATIONS

In turning Road Home files over to Defendants, OCD made available all of its grant records, either through direct access to OCD's databases or by running queries for Defendants as needed.  Nonetheless, Defendants did not check the dates on which payments had been made by FEMA and their private insurers before dunning Plaintiffs. ROA.6338-39, 6812-14.

### 1. Plaintiff Calogero

On February 9, 2018, more than ten years after Mrs. Calogero's grant transaction, Defendants sent her a collection letter, also known as a dunning letter. The reference line stated, "Total Grant Funds Repayment Amount Due: $4,598.89." The letter stated:

> Our client's records indicate that you received more in total insurance proceeds than the amount used to calculate your grant award. Since you have not repaid those additional insurance funds to Road Home in accordance with your Road Home Grant Agreement, you have breached your Grant obligations. Those obligations are clearly outlined in your Road Home Grant Agreement.

Tab, 10, RE-121, ROA.7929. The letter continued, "Road Home may proceed with further action against you, including legal action" and further stated: "[y]ou may also be responsible for legal interest from judicial demand, court costs, and attorney's fees if it is necessary to bring legal action against you."

Mrs. Calogero believed she had fulfilled her obligations, and she did not understand why she would owe any money. Then age 83, she worried about being sued, losing her house, damaging her credit score, and burdening her children with a debt after her death, especially if attorneys' fees would be added on. Because she was intimidated and did

not understand how she could owe any money, she retained counsel. Through counsel, she disputed the claim. ROA.6872-73.

Defendants replied by letter dated April 10, 2018. Tab 11, RE-123, ROA.7940-42. This follow-up letter changed the basis of the alleged debt from insurance proceeds alone to include FEMA relief and provided OCD's calculation method, including a 30% penalty for lack of flood insurance. Contrary to the district court's characterization, Defendants *never* suggested that Mrs. Calogero made any "misrepresentations" in her grant application. ROA.8470-71, citing Defendants' 4/10/18 letter.

### 2. Plaintiff Randolph

Likewise, Defendants issued Mrs. Randolph a collection letter on August 3, 2017, demanding $2,500; that letter offered no explanation of the alleged debt except to refer her to the Road Home Agreement executed ten years earlier. Tab 9, RE-119, ROA.7927.

Mrs. Randolph did not understand Defendants' letter, and she was terrified because she did not have the money demanded and feared she would be sued and lose her home. In response to Defendants' letter, Mrs. Randolph called Defendants' office to ask what she could do. She was told the only thing was to pay the money. She explained that she did not have

the money, and was told they might accept monthly payments if she signed a promissory note committing to pay the full amount. ROA.6887.

By letter dated September 25, 2017, Defendants outlined payment terms and transmitted the note to Mrs. Randolph. ROA.7038-39. Because she believed this was the best deal she could get and acceptance was the only way to avoid being sued and owing even more money (ROA.6887), Mrs. Randolph signed the promissory note on October 24, 2017. Tab 12, RE-127, ROA.7041. No one told Mrs. Randolph that the debt was time-barred, and if she had known that she could not be sued for the debt on that date, she would not have signed because she did not understand why she would owe any money. ROA.7030. Mrs. Randolph makes monthly payments because of the note. Tab 13, RE-129, ROA.7043; *see also*, ROA.7044-57.

## B.   Procedural History

Plaintiff Calogero initiated this class action on July 16, 2018. ROA.26.  It was dismissed a year later for failure to state a claim upon which relief could be granted. ROA.299.  On appeal, this Court reversed, holding that the claims *did* arise from collection activity within the protection of the FDCPA. ROA.305. This Court also noted that discovery

would be needed to determine whether the State functioned as a federal agent in administering HUD's CDBG grant. ROA.318.

Since remand, the Complaint has been twice amended. The Second Amended Complaint includes additional Named Plaintiff Randolph, and four FDCPA claims: (1) failing to itemize the basis of the alleged debts; (2) collecting or attempting to collect time-barred debt; (3) threatening to assess attorneys' fees without determining whether such right existed; and (4) failing to advise that signing a promissory note and/or making repayment would restart the statute of limitations. ROA.810.

Plaintiffs moved for class certification (ROA.1823), and moved for summary judgment on each of their four claims (ROA.2436, ROA.4396, ROA.6276, ROA.6900). Defendants also moved for summary judgment, relying on an affidavit from an unrelated proceeding. ROA.6230. Plaintiffs objected to this untraversed hearsay as irrelevant and inadmissible, and moved to strike it and all reference thereto. ROA.7558.

The district court ruled on all of these motions by Order and Reasons issued July 12, 2022. ROA.8467-8528. Judgment was entered on that same date. ROA.8529.

This appeal follows.

## SUMMARY OF THE ARGUMENT

The district court committed a series of errors, resulting in erroneous dismissal of Plaintiffs' four FDCPA claims and denial of class certification. These rulings should be reversed on *de novo* review.

On Plaintiffs' first claim challenging Defendants' failure to itemize the amounts demanded, the district court mishandled summary judgment standards by injecting an immaterial issue of fact to make an improper – and unfounded – presumption that Plaintiffs owed the alleged debts. This blinded the court to the issue before it: whether Defendants' dunning letters allowed "the unsophisticated consumer" to knowledgeably assess the validity, if any, of the alleged debts. Instead of applying this Court's objective standard, the lower court misapplied a questionable materiality standard by failing to recognize that the "what," "when," and "how-calculated" elements of any debt are material.

The district court similarly erred on Plaintiffs' third claim, which challenges Defendants' authority to threaten taxing attorneys' fees in any collection suit. On cross-motions for summary judgment, the parties disputed interpretation of the Road Home Agreement and its multiple

attorneys-fee provisions – only. On that issue, the district court erred by finding authorization within an inapposite contract.

The district court then violated Rule 56 by raising and ruling, *sua sponte*, on its hypothetical "theory of fraud" as an additional basis supporting Defendants' threat to recover fees. This theory is unsupported by the record, which confirms that neither Mrs. Calogero nor Mrs. Randolph was suspected of *any* fraud. The court did not provide the notice mandated by Rule 56(f) before drawing factual conclusions contrary to undisputed facts, thus it erred as a matter of both law and fact.

The court also erred in dismissing Plaintiffs' time-bar claims. Based on the FDCPA's prohibition against misrepresenting judicial enforceability of a debt, Plaintiffs' second and fourth claims challenge Defendants' threats to take legal action more than ten years after their grant transactions. These claims require determination of which time-bar applies to Defendants' collection activities and when it commenced to run.

The district court's threshold error on these claims was skipping preemption analysis before applying a Louisiana prescriptive period. It then bypassed this Court's instruction from the first appeal regarding the

factual record needed to determine whether the State and its contractors functioned as federal agencies in these collection efforts. Although Plaintiffs developed such a record on remand, the district court violated principles of collateral estoppel by relying on the factual record of a separate case, premised on inadmissible hearsay. The court then misapplied principles of tort liability to this contract-oriented action, which caused it to overlook the controlling caselaw.

The jurisprudence discounted by the court below recognizes that non-federal administrators of HUD grants become subject to federal law, and further establishes that a federal statute of limitations applies where the federal government maintains an interest in the funds at issue, as here. Properly analyzed, the law and this record support application of the six-year limitations period of 28 U.S.C. § 2415. Or, if state law governs, then the five-year period of Louisiana Civil Code Article 1564 applicable to onerous-donation contracts is more appropriate to the grant agreements here – rather than the ten-year period of Article 3499 for innominate contracts chosen by the lower court.

The court also erred in determining when the limitations period commenced to run, misapplying the doctrine of *contra non valentem* to

suspend prescription beyond the 2007 dates when the State *received* notice of potentially duplicative payments, to the date the State *reviewed* that notice many months later, in 2008. This interpretation wrongly excises the diligence component from *contra non valentem*, and results in impermissibly stretching suspension from the event that excites inquiry to the event documenting the results-of-inquiry.

Plaintiffs submit that the district court erred in determining both which limitations period applies and when it commenced to run. However, based on the undisputed facts, correction of either point warrants reversal of the district court's dismissal of Plaintiffs' second claim, challenging Defendants' threats to sue on time-barred debt. Likewise, correction of either determination would also resurrect Plaintiffs' fourth claim, faulting Defendants' failure to advise Mrs. Randolph that signing a promissory note and making payment could revive the prescribed debt.

In sum, more than ten years after Hurricane Katrina devastated Mses. Calogero and Randolph, Defendants hit them with dunning letters that caused them to fear for their homes, again. This attempted collection of debts that were likely not even owed savaged the eleemosynary aims

of the Road Home program. Further, Defendants' collection efforts were so misleading and unfair as to violate the FDCPA as a matter of law, which warrants entry of summary judgment in favor of Mses. Calogero and Randolph. This appeal asks this Honorable Court to find Defendants liable for their FDCPA violations so that future disaster victims are not subjected to the forbidden collection practices suffered by Plaintiffs and the class they seek to represent.

# ARGUMENT

## I. Summary judgment is reviewed *de novo*.

Motions for summary judgment are reviewed *de novo*, applying the same legal standard as the district court.[8] Cross-motions are reviewed independently."[9]

Here, the lower court erred by violating the following constraints: (1) irrelevant disputes must not be considered because the substantive law of the suit identifies which facts are material;[10] (2) a court may not resolve credibility issues or weigh evidence, instead the court must draw all reasonable inferences in favor of the nonmoving party;[11] (3) a court must give notice before granting summary judgment on grounds not raised by a party.[12]

---

[8] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008).

[9] *A.A. v. Northside Indep. Sch. Dist.*, 951 F.3d 678, 684 (5th Cir. 2020), citing FED. R. CIV. P. 56(a).

[10] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hulsey v. U.S. Air, Inc.*, 868 F.2d 1423, 1426 (5th Cir. 1989).

[11] *Delta*, 530 F.3d at 398-99; *Goswami v. Am. Collections Enter., Inc.*, 377 F.3d 488, 492 (5th Cir. 2004).

[12] *D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 210 (5th Cir. 2018) (internal quotations omitted).

## II.    The district court misconstrued the FDCPA.

The lower court also disregarded the following precepts of the FDCPA, the substantive law that determines materiality for summary judgment here.

### A. An FDCPA claim challenges the debt collector's *practices*, not the alleged debt.

The purpose of the FDCPA is to protect the least sophisticated consumer from collection abuse, including false, deceptive, or unfair collection methods. *Manuel v. Merchants & Prof'l Bureau, Inc.*, 956 F.3d 822, 826 (5th Cir. 2020). However, the district court failed to recognize that this purpose encompasses *everyone* who is the object of FDCPA-protected collection – whether or not they owe the debt, and whether or not they dispute that debt. Everyone requires protection, Congress recognized, because "the number of persons who willfully refuse to pay just debts is miniscule." S. REP. NO. 95-382, at 3 (1977). Thus, the FDCPA imposes liability "regardless of whether the debt is valid." *McCartney v. First City Bank*, 970 F.2d 45, 47 (5th Cir. 1992); *accord, Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.*, 111 F.D 1322, 1324 (7th Cir. 1997).

An FDCPA claim consists of three elements, that: (1) the plaintiff has been the object of collection activity arising from consumer debt, (2) the defendant is a debt collector as defined by the FDCPA, and (3) the defendant has engaged in an act or omission prohibited by the FDCPA. *Sibley v. Firstcollect, Inc.*, 913 F. Supp. 469, 471 (M.D. La. 1995), cited with approval by *Hall v. Phenix Investigations, Inc.*, 642 F. App'x. 402, 405 (5th Cir. 2016). Only the third element is at issue now.[13]

### B. This Court evaluates an FDCPA claim from the objective perspective of "an unsophisticated consumer" – not according to "materiality" of the challenged conduct.

The lower court reached beyond the law of this Circuit to declare: "When assessing whether a defendant's actions are false, deceptive, or misleading under §1692e, courts impose a 'materiality standard.'" ROA.8475, citing *Gomez v. Niemann & Heyer, L.L.P.*, No. 16-cv-119, 2016 WL 3562148, at *4 (W.D. Tex. June 24, 2016). The court continued: "A false, deceptive, or misleading statement is 'material' when it has the ability to influence a consumer's decision." *Id.* But only *some* courts

---

[13] The first element was resolved in the first appeal, which held that Plaintiffs' claims are within the protection of the FDCPA. ROA.305. Defendants admitted the second element. *See*, ¶11 at ROA.419, 812, 1626.

impose this standard; and, to date, both this Court and the U.S. Supreme Court have declined to do so.

Rather than endorse *Gomez* and its extra-Circuit materiality standard, this Court recently reiterated: "We evaluate whether a collection letter violates §1692e by viewing the letter from the perspective of an unsophisticated or least sophisticated consumer." *Salinas v. R.A. Rogers, Inc.*, 952 F.3d 680, 683-84 (5th Cir. 2020).[14]  This perspective is an objective standard. *McKenzie v. E.A. Uffman and Assoc., Inc.*, 119 F.3d 358, 362 (5th Cir. 1997).

Likewise, to date, the U.S. Supreme Court has declined to address "whether a false or misleading statement must be material to violate the FDCPA, or whether a potentially false or misleading statement should be viewed from the perspective of 'the least sophisticated consumer.'" *Sheriff v. Gillie*, 578 U.S. 317, 327 n. 6 (2016) (citation omitted).

Proper analysis of the law and record here confirms that Defendants violated the FDCPA under *either* standard.

---

[14] *See, Salinas*, No. SA-18-cv-733, 2019 WL 2465325, at *3 (W.D. Tex. June 13, 2019) (applying materiality standard espoused by *Gomez, supra*).

### C. Plaintiffs charge Defendants with violating §1692e and §1692f – not §1692g – of the FDCPA.

Many of the district court's authorities address §1692g, which requires debt collectors to identify the total amount due.[15] However, §1692g has never been an issue here because Defendants' dunning letters *do* specify an amount due. Moreover, neither the accuracy nor the validity of the alleged debts has ever been presented, much less proved, to any court. Instead, Plaintiffs fault Defendants for their incomplete and incorrect presentation of the basis of the alleged debts, as well as their threats to take actions that cannot legally be taken, in violation of §1692e and §1692f.

Specifically, Plaintiffs allege Defendants have violated §1692e, which prohibits debt collector's from using any false, deceptive, or misleading representations, as well as its multiple subsections, described as a "non-exclusive list of proscribed practices." *Salinas*, 952 F.3d at 683. Plaintiffs further allege that Defendants have violated §1692f, which is a

---

[15] *See, e.g.*, *Hepsen v. J.C. Christensen & Assocs., Inc.*, No. 07-cv-1935, 2009 WL 3064865, at *5 (M.D. Fla. Sept. 22, 2009), *aff'd sub nom.*, *Hepsen v. Resurgent Cap. Servs., L.P.*, 383 F. App'x 877 (11th Cir. 2010) (dunning letter must state the exact and correct amount of the debt in order to comply with §1692g). Typical §1692g cases challenge the accuracy of a debt collector's interest calculation or compliance with safe-harbor notices regarding interest accrual – issues relating to the precision and shelf-life of the amount demanded.

"backstop" to address conduct outside that specifically forbidden under the statute. *Manuel*, 956 F.3d at 825-26. That is, §1692f is *different* than §1692e, as it must be to ensure that "artificial constraints" are not placed on "broad terms" like "deceptive" and "misleading" under a statute that should be "construed broadly" and "in favor of the consumer." *Id.* The pertinent provisions of §1692e and §1692f are reproduced in the Addendum hereto.

### III. The district court erred in dismissing Plaintiffs' first claim regarding Defendants' failure to itemize the alleged debts.

#### A. The FDCPA requires that collection letters fairly inform the unsophisticated consumer.

Although Plaintiffs' failure-to-itemize claim presents an issue of first impression to this Court, it is premised on *Fields v. Wilber Law Firm, P.C.*, 383 F.3d 562 (7th Cir. 2004) and sounds in Fifth Circuit precedents which embrace the FDCPA's requirement that collection letters fairly inform the unsophisticated consumer. *See*, *e.g.*, *Daugherty v. Convergent Outsourcing, Inc.*, 836 F.3d 507 (5th Cir. 2016), *Manuel*, 956 F.3d at 832 (recognizing "ambiguity itself can prove a violation").

*Fields* evaluated a collection letter that announced to the consumer only the total amount due – without explaining it was the sum of multiple components. The court faulted this presentation for "leaving the door open" for the debtor to "wonder" about the nature of the debt and its calculation. 383 F.3d at 566. Such an open-door presentation was "misleading because it gave a false impression of the character of the debt." *Id.* Further, it was "unfair to consumers" to "hide the true character of the debt, thereby impairing their ability to knowledgeably assess the validity of the debt." *Id.*

*Fields* involved post-transaction attorneys' fees – which the lower court highlighted – but *Fields* named such "add-on" fees as an example, not a criterion, of what a debt collector must include in a dunning letter. The court explained that "an unsophisticated consumer may have lost the bill and forgotten the amount of the debt completely" and the debtor "might logically assume" that the amount demanded was the amount incurred, particularly given the passage of time. *Id.* at 565-66. Thus, the court emphasized that "debt collectors must clearly and fairly communicate information about the amount of the debt to debtors" and advised:

One simple way to comply with §1692e and §1692f in this
regard would be to itemize the various charges that comprise
the total amount of the debt.

*Id.*[16]

To date, one other court in this Circuit has considered failure-to-

itemize claims: the U.S. District Court for the Western District of Texas,

which found the analysis of *Fields* "convincing" to achieve the FDCPA's

"policy of facilitating informed, intelligent decision-making by

consumers." *Gomez*, 2016 WL 3562148 at *5.[17]

---

[16] Many courts have followed *Fields'* lead. *See, e.g., Tepper v. Amos Fin., LLC*, No. 15-cv-5834, 2017 WL 3446886, at *10 (E.D. Pa. Aug. 11, 2017), *aff'd*, 898 F.3d 364 (3d Cir. 2018) (declaring that lump-sum statements "as to the character and amount of debt owed were so incomplete and misleading that they amounted to false representations within the meaning of §1692e(2)(A) and §1692e(10)"); *Bradley v. Franklin Collection Serv., Inc.*, No. 10-cv-01537, 2011 WL 13134961, at *11 (N.D. Ala. Mar. 24, 2011) (maintaining FDCPA claim where collection letters did not specify the components of the total due); *Meyer v. Fay Servicing, LLC*, 385 F. Supp. 3d 1235 (M.D. Fla. 2019) (maintaining FDCPA claim because "failing to break down the charges" gives misleading impression about the character of the debt); *Grubb v. Green Tree Servicing, LLC*, No. 13-07421, 2014 WL 3696126, at *9 (D.N.J. July 24, 2014) (recognizing FDCPA claim where collection letter provided only lump-sum due without calculation details "because debt collectors are required to not only convey the required information but to do so effectively"); *LaMonaca v. First States Fin. Servs. Corp.*, No. 18-11829, 2019 WL 2636656, at *4 (D.N.J. June 27, 2019) (recognizing that an amount due may include multiple components but a collection notice "should itemize the various charges that comprise the total amount of the debt"); *Smith v. Am. Rev. Corp.*, No. 04-cv-0199, 2005 WL 1162906 (N.D. Ind. May 16, 2005) (disapproving amalgamation of multiple sources of debt); *Deporter v. Credit Bureau of Carbon Co.*, No. 14-cv-00882, 2015 WL 1932336 (D. Colo. Apr. 28, 2015) (finding FDCPA violation where debt collector "aggregated" or "summarized" amounts owed without itemization).

[17] *See also, Meraz v. M. Susan Rice, P.C.*, No. 09-CA-138, 2009 WL 10669232 (W.D. Tex. May 15, 2009) (citing *Fields* to emphasize that debt collectors "must still clearly

FDCPA cases also emphasize that the information needed to prevent confusion or deception must be contained in the initial collection letter; an invitation to contact the debt collector for additional information does not suffice.[18] As one court of appeal explained, the notion that a debt collector is FDCPA-compliant if he invites the debtor to make contact "would transform many of the FDCPA's substantive provisions into surplusage."[19] Further, the itemization itself must not be confusing or deceptive in order to comport with the FDCPA.[20]

## B. The district court's new "rule" departs from *Fields* and the FDCPA.

The district court here departed from *Fields* and its progeny to announce a new rule:

---

and fairly communicate information about the amount of the debt to debtors" even where demand is contractually-authorized); *Hackler v. Tolteca Enter., Inc.*, No. 18-cv-00911, 2019 WL 6727874 (W.D. Tex. Dec. 11, 2019) (finding letter demanding lump-sum without identifying fee component was impermissible).

[18] *Miller v. McCalla, Raymer, Cobb, Nichols & Clark, L.L.C.*, 214 F.3d 872, 875 (7th Cir. 2000) (holding that FDCPA is violated where collection letter contains incomplete information about the debt, notwithstanding toll-free number provided for debtor to make inquiry).

[19] *Tourgeman v. Collins Fin. Servs., Inc.*, 755 F.3d 1109, 1122 (9th Cir. 2014), *as amended on reh'g* (Oct. 31, 2014).

[20] *Dougherty v. Wells Fargo Home Loans, Inc.*, 425 F. Supp. 2d 599, 608 (E.D. Pa. 2006) (finding characterization of attorneys' fees as "recoverable corporate advances" could be confusing and deceptive to an unsophisticated consumer, notwithstanding itemization).

Generally, then, the caselaw indicates that collection-related expenses should be itemized in collection letters, but that principal and interest need not be. But cases like *Fields* (upon which Plaintiffs heavily rely) and *Hahn* are inapposite here where there is no dispute that the total debt recited is accurate and did not include any collection-related fees or interest. Where the total debt is clear and accurate, a precise, itemized breakdown of the component parts of the debt is not necessary.

***

What follows from these cases, and the rule that principal and interest need not be itemized, is that the principal debt itself need not be itemized.

ROA.8481-82 (internal citations omitted). The several errors contained in this newly-fashioned rule require some unpacking.

1. **The district court impermissibly addressed the immaterial issue of "accuracy" of the alleged debt – and ruled incorrectly.**

First, the district court mishandled summary judgment standards by injecting an immaterial issue of "accuracy" of the alleged debts. To do so, the court muddled the caselaw interpreting §1692g (which requires debt collectors to identify the amount due) with that of §1692e (which prohibits false, misleading, deceptive communications).[21] However,

---

[21] For example, the district court cited *Goodrick v. Cavalry Portfolio Servs., LLC*, No. 12-1822, 2013 WL 4419321 (D. Ariz. Aug. 19, 2013) for the proposition that a dunning letter's lack of specificity about "otherwise accurate" debt does not affect a debtor's ability to "intelligently choose" a response. ROA.8481. But *Goodrick* addressed a

§1692g has never been an issue in this case; besides, its requirements do not override the §1692e principle that language in a collection letter can be "literally true" and still be misleading in a way that violates the FDCPA.[22]

The district court then compounded this error of law with an error of fact, declaring: "Plaintiffs do not contend that the total debt recited in the collection letters is inaccurate"[23] – despite the undisputed fact that both Mses. Calogero and Randolph *disputed* the alleged debts.[24] Because the court believed – albeit incorrectly – that Plaintiffs owed the debts,

---

debtor who was admittedly aware of the original interest charged, and the court reasoned that "even the most unsophisticated debtor" understands that interest *continues* to accrue. In that context, and because the debt collector's arithmetic satisfied §1692g, "accuracy" precluded a false, deceptive, or misleading communication in violation of §1692e. *See also*, *Kolbasyuk v. Cap. Mgmt. Servs., LP*, 918 F.3d 236 (2d Cir. 2019); *Taubenfliegel v. EGS Fin. Care, Inc.*, No. 18-cv-1962, 2018 WL 3079697 (E.D.N.Y. June 21, 2018), discussed *infra*. These §1692g cases addressing accuracy of the interest calculations and "shelf-life" of the amount demanded are inapposite to Plaintiffs, whose debts do not involve interest accrual that changes the amount due over time.

[22] *Heredia v. Cap. Mgmt. Servs., L.P.*, 942 F.3d 811, 815 (7th Cir. 2019); *accord*, *Gonzales v. Arrow Fin. Servs., LLC*, 660 F.3d 1055, 1062 (9th Cir. 2011).

[23] ROA.8485, reiterated at ROA.8488: "Plaintiffs do not argue that the amounts the letters state as due are inaccurate."

[24] ROA.4567, 4575, 4576, ns. 2, 3, 4; *see also*, pp. 35-37, *infra*.

the court concluded that Defendants' letters were "true" and thus could not be false or deceptive. ROA.8488.

The district court's confusion resulted in summary judgment error, whether accuracy is material or immaterial. If accuracy of the debt is immaterial to Plaintiffs' FDCPA claim, as Plaintiffs maintain, then the district court erred by considering the issue at all.[25] And, even if accuracy were material, then the district court violated summary judgment standards by either impermissibly weighing the parties' credibility to find a disputed fact in favor of Defendants (rather than confining its evaluation to determining whether issues of material fact exist); or, by failing to recognize that Plaintiffs had disputed the alleged debts, and further failing to apply the proper inference in favor of Plaintiffs as non-movants on this point.[26]   Either way, the district court's treatment of accuracy of the alleged debts violated summary judgment rules, resulting in erroneous grant of summary judgment in favor of Defendants.

---

[25] *McCartney*, 970 F.2d at 47; *Anderson*, 477 U.S. at 248; *Hulsey*, 868 F.2d at 1426.

[26] *Delta*, 530 F.3d at 398-99; *Goswami*, 377 F.3d at 492.

Although validity of a debt is immaterial to an FDCPA action, it is nonetheless relevant here to refute the district court's unfounded presumption that Mses. Calogero and Randolph owed duplicate benefits.[27]

First, Road Home funds could be duplicated only by funds paid on the **same property damage,** as the Agreement itself provides. *e.g.*, ROA.7728 (assigning rights related to "physical damage to the Residence"). As HUD explained:

> For example, if FEMA funds were eligibly used for interim housing, and CDBG funds were provided for home rehabilitation, there is no duplication regarding those funds because the funds were provided for different purposes.

76 Fed. Reg. 71062-63.

State Farm's $2,500 payments immediately after Katrina's landfall, long before the floodwaters receded or adjusting could commence, are likely for relocation rather than property damage. As such, these insurance payments were not subject to disclosure – or recapture. Thus, the insurance duplications allegedly owed by Mses.

---

[27] Because validity of the debt was not before the lower court (or any other court), the parties did not specifically address whether Plaintiffs did, or did not, owe the debt – a matter for which Defendants' client OCD would have had the burden of proof in a state court action. This explication is provided based on the material of record to dispel the lower court's erroneous presumption.

Calogero and Randolph are likely invalid because they are not duplications at all.

Also, Mrs. Calogero's entire FEMA award is contained within the grant application section of OCD's records, which indicates that Mrs. Calogero *did* disclose her FEMA awards, including the $5,300 payment subject to Defendants' collection efforts. ROA.7833. This suggests that any grant overpayment was due to OCD/ICF's miscalculation of her award, which is the subject of OCD's pending litigation to recoup such overpayments *from ICF*. ROA.7901-04. It further establishes that Mrs. Calogero cannot be faulted for non-disclosure, nor do the undisputed facts demonstrate "misrepresentation" or "a theory of fraud" as suggested by the lower court.

Plaintiffs' alleged debts have never been presented, or proved, to any court. Moreover, Plaintiffs obtained this information through discovery in *this* action, not from Defendants' dunning letters or any other communication. Again, debt validity is immaterial here, but this background illustrates how Plaintiffs have been wronged at every turn, most recently by the lower court's unfounded presumption that the alleged debts were valid.

## 2. Sufficiency of a dunning letter depends on the communication – not the type of costs.

In addition, the lower court's purported rule limiting itemization to "add-on" costs rests on flawed analysis of two "instances" of cases considering the sufficiency of a debt collector's itemization: those where the amount demanded consists of principal plus collection-related costs, which the district court characterized as "add-ons" to the originally-transacted amount (ROA.8478-80), and those where the amount demanded consists of principal plus interest, which it categorized as a non-collection-related cost (ROA.8480-82). The court then announced, summarily, that "principal debt itself need not be itemized." ROA.8482.

## 3. Road Home debts do not involve costs.

The lower court's rule is inapt because Plaintiffs' claim is unlike any case cited by the lower court. No costs are at issue, and the information that Defendants' dunning letters omitted, or misstated, was unknowable from the underlying Road Home agreement.

Nearly eleven years after Mrs. Calogero's transaction for a $33,393 Road Home grant, Defendants dunned her for $4,598.89. As shown below, the State arrived at this amount by a series of complex and possibly erroneous calculations, which involved recalculating the amount

of her initial grant, itself derived from a formula that had never been disclosed to Mrs. Calogero.   Similarly, Defendants claimed, without elucidation, that Mrs. Randolph was obliged to repay $2,500 of her $28,793 grant. Both Plaintiffs were mystified by the numbers, and Defendants' dunning letters omitting the "what," "when," and "how-calculated" elements of their demands were inscrutable.

### 4. The cases surveyed by the lower court suggest that itemization is required unless the amount demanded is discernible from the underlying contract.

The lower court's distinction between collection-related fees and non-collection-related fees fails to recognize the *reason* debt collectors are exempt from breaking down non-collection-related fees: the amount demanded is discernible from the underlying contract.

For example, in the context of contractually-authorized compounding interest, "today's interest becomes tomorrow's principal." *Hahn v. Triumph P'ships, LLC*, 557 F.3d 755, 757 (7th Cir. 2009). Therefore, all such past-due amounts may be described properly as principal due. *That* is why "the difference between principal and interest is no more important to the [FDCPA] than the color of paper" used by a debt collector, and *that* is why a "dollar due is a dollar due" – because the

type of expense and its calculation is detailed in the underlying contract. *Id.*

Rather than differentiate costs, proper analysis of the cases recited by the lower court considers whether the debt collector's communication, in tandem with the underlying contract, provides an unsophisticated consumer sufficient information to assess the demand. The lower court failed to conduct such an analysis vis-à-vis Plaintiffs' contracts.

Overall, the cases cited by the district court undermine its own rule. For example, the district court's reliance on *Vogel*, a never-before-cited, unpublished Illinois decision, for the proposition that a debt collector need not "itemize ordinary charges that a consumer has rung up for goods and services with a particular creditor" has no application whatsoever to Road Home agreements. ROA.8482, citing *Vogel v. McCarthy Burgess & Wolff, Inc.*, No. 17-cv-6681, 2020 WL 6134987 (N.D. Ill. Oct. 19, 2020).

*Vogel* involved a debt arising from a consumer's month-long joyride in a rental car, which resulted in an invoice itemizing the damage charges incurred – a key fact in rejecting Vogel's claim. *Id.* at *9 ("All of the itemized charges that Vogel complains about were listed in Payless' original invoice").

Unlike the debt collector's demands in *Vogel* and every other case cited by the district court, the amount demanded by Defendants here does not match the amount of each Plaintiff's original transaction and is not discernible from the original contract. Mrs. Randolph's original transaction was for $28,793; Defendants demanded $2,500 without identifying any basis whatsoever. They just referred her to her original Road Home Agreement – a lengthy, ten-year-old document containing at least eight obligations, all of which Mrs. Randolph has fully performed, so far as she knows. Defendants' letter does not even hint at which ones she allegedly breached, or when. ROA.7927.

Defendants' dunning letter to Mrs. Calogero contained more information than was provided to Mrs. Randolph, but it was *wrong*. Mrs. Calogero's original transaction was for $33,393; Defendants demanded the precise-but-mysterious amount of $4,598.89. The mystery deepened because Defendants initially claimed her debt arose from insurance proceeds. ROA.7929. However, upon inquiry through counsel, Defendants subsequently claimed the debt arose primarily from FEMA assistance. ROA.7941. This explanation was further confounded by application of a 30% penalty based on a formula that is not contained in

the underlying Agreement and was otherwise unknowable to Mrs. Calogero.

Nothing about Defendants' opaque dunning letters referencing a ten-year-old contract containing a multitude of performance obligations to implement the largest disaster relief program in the nation's history is akin to *Vogel's* circumstance of collecting previously-invoiced "ordinary charges" from a joyriding rental-car driver.

Equally inapposite is the New York case cited for the proposition that courts reject a requirement of "exhaustive disclosure." ROA.8482, citing *Taubenfliegel*, *supra*, which addressed safe-harbor language regarding interest accrual, known as "*Avila* notice" in the Second Circuit. Critically, the district court's quoted excerpt exempts such notice when no interest is accruing on the debt. 2018 WL 3079697 at *4. That is, debt collectors need not "exhaustively disclose" the fact that there is nothing to disclose. *Taubenfliegel* does *not* exempt a debt collector from disclosure of FDCPA-required information that exists, as the types of alleged duplicate benefits and dates of purported payment existed in OCD's records here.

The lower court also mentioned a Michigan case for the superfluous proposition that the FDCPA does not affirmatively require a debt collector to provide a breakdown of the debt. ROA.8482, citing *Wilson v. Trott*, 118 F. Supp. 3d 953, 956 (E.D. Mich. 2015). But the FDCPA's proscription against misleading a debtor requires whatever explication is needed to permit the debtor to understand the demand. Indeed, *Wilson* ruled *against* the debt collector because a term used in its dunning letter was not defined in the underlying contract, thereby running "afoul" of §1692e. *Id.* Thus, *Wilson* is an example of evaluating a dun by reference to the underlying contract, which the lower court did not do here – and which would establish that Defendants, too, ran "afoul" of the FDCPA by making demands that were not defined by the Road Home Agreement, such as the undisclosed penalty formula levied on Mrs. Calogero.

Next, the lower court touched on an Indiana case exempting a debt collector from itemization of the debt "so long as its statement of the total is clear and accurate." ROA.8478, citing *Moran v. Greene & Cooper Att'ys LLP,* 43 F. Supp. 3d 907 (S.D. Ind. 2014), which addressed the accuracy of the interest rate and arithmetic underlying the sum demanded, akin

to *Taubenfliegel* and *Goodrick*, *supra*. Although inapposite to Plaintiffs'

claims, *Moran* is nonetheless instructive when quoted fully:

> It is not enough that the dunning letter state the amount of
> the debt that is due. It must state it clearly enough that the
> recipient is likely to understand it.

*Id.* at 914.

From this patchwork, the district court declared "the principal debt

itself need not be itemized." ROA.8482, citing *Kolbasyuk*, 918 F.3d at 239.

This is incorrect, and once again blurs the accuracy prescribed by §1692g

with the false, misleading, or deceptive representations proscribed by

§1692e. In fact, the Second Circuit held that "a debt collection letter that

informs the consumer of the total, present quantity of his or her debt

satisfies Section 1692g, notwithstanding its failure to inform the

consumer of the debt's components or the precise rates by which it might

later increase." *Id.* Again, neither interest accrual nor its arithmetic is

at issue here. And, to the extent *Kolbasyuk* could apply to Plaintiffs'

§1692e claim, it would establish that Defendants' omission of *Avila* notice

constitutes an FDCPA violation. *Id.* at 242.

## C. The district court conflated §1692e and §1692f.

The district court summarily dismissed Plaintiffs' §1692f claim: "Nor does Defendants' presentation of the debt in the collection letters constitute an 'unfair' attempt or means to collect a debt." ROA.8487. This lone, unsupported sentence is the entirety of the district court's treatment of §1692f, the provision this Court calls the "backstop to catch conduct outside that barred by §1692e and other provisions." *Manuel*, 956 F.3d at 825.

However, Sections 1692e and 1692f are not interchangeable. Section 1692e "mainly targets practices that take advantage of a debtor's naïveté or lack of legal acumen," whereas §1692f "is aimed at practices that give the debt collector an unfair advantage over the debtor or are inherently abusive."[28]  The fact that Defendants withheld necessary information about the alleged debts arising from aged transactions constitutes an "unfair advantage," at least.

---

[28] *Arias v. Gutman, Mintz, Baker & Sonnenfeldt, LLP*, 875 F.3d 128, 135-36 (2d Cir. 2017); *see also, Houser v. LTD Fin. Servs., LP*, 512 F. Supp. 3d 746, 753 (S.D. Tex. 2021) (discussing interplay between §§ 1692e, 1692f).

By failing to analyze the unfairness of Defendants' conduct under the broader "backstop" of §1692f, the lower court impermissibly conflated this provision with §1692e.

### D. The district court misapplied the materiality standard.

The district court also erred in finding that the omissions or ambiguity contained in Defendants' dunning letters were "immaterial" to Plaintiffs' decision-making. ROA.8487-92. To do so, the court misapplied the materiality standard by putting the cart before the horse – twice – to circumvent the issue presented by Plaintiffs' failure-to-itemize claim: whether Defendants' non-itemized dunning letters impaired *Plaintiffs*' ability "to knowledgeably assess the validity of the debt." *Fields*, 383 F.3d at 566.

First, instead of evaluating Defendants' letters through this Court's objective lens of the unsophisticated consumer, the district court interposed its own assessment to declare:

> Calogero did indeed receive insurance payments she did not disclose in applying for her Road Home grant and she was indeed obligated to repay those amounts. That she was also obligated to repay undisclosed FEMA payments did not make this statement any less true. Similarly, Randolph did indeed breach her Road Home grant obligations by not disclosing all payments she had received.

ROA.8488.

This statement not only transgresses summary judgment standards by injecting the non-material issue of debt validity, discussed *supra*; it illustrates the *raison d'être* of the unsophisticated consumer standard:

> Unsophisticated readers may require more explanation than do federal judges; what seems pellucid to a judge, a legally sophisticated reader, may be opaque to someone whose formal education ended after sixth grade.

*Id.*

Indeed, this exhortation hits home because Plaintiff Randolph *is* "someone whose formal education ended after sixth grade." ROA.6886. Moreover, the lower court's assessment fails to recognize that a statement can be "literally true," but nonetheless misleading in a way that violates the FDCPA. *Heredia, supra*; *Gonzales, supra*.[29]

---

[29] Besides, these statements are likely *not* true. *See*, pp. 35-37, *supra*.

The court continued, again short-circuiting the failure-to-itemize issue, by positing a "heads I win, tails you lose" test for materiality:

> At most, Defendants' collection letters…may contain immaterial omissions or ambiguity…But neither representation [to Plaintiffs] is material as would have hindered Plaintiffs' decisions about how to respond. Regardless of these immaterial representations, Plaintiffs' only two choices were clear: either dispute or pay the amount of the stated debt. And this is exactly what occurred. Calogero challenged the accuracy of her Road Home debt, and Randolph entered into a payment plan to satisfy hers.

ROA.8491-92 (internal citations omitted). This rationale presupposes that *any* decision is an *informed* decision – a supposition by which the debt collector's letter is FDCPA-compliant every time.

This is not what "material" means, in any Circuit. How could the "what" and "when" and "how-calculated" elements not be material to a consumer's ability to knowledgeably assess the debts? This information is particularly critical where, as here, *none* of these elements were contained in *either* Defendants' dunning letters *or* Plaintiffs' underlying Agreements executed more than ten years earlier.

The lower court also mischaracterized the "choices" made by Plaintiffs. Mrs. Calogero did not simply "dispute" the debt; she was so bewildered and intimidated by Defendants' letter that she *retained*

*counsel* to protect herself. ROA.6873. Likewise, Mrs. Randolph did not simply "pay;" she was so terrified and confused by Defendants' letter that she agreed to pay a debt she does not understand, likely does not owe, and definitely cannot afford. ROA.6887-88. Neither "choice" proves Defendants complied with the FDCPA by providing Plaintiffs with enough information "to knowledgeably assess the validity of the debt." *Fields*, *supra*.

Simply put, nothing is immaterial about the FDCPA violations at issue here. The errors, omissions, and ambiguities of Defendants' non-itemized letters are as *material* as representations about a debt can be; the "what" and "when" and "how-calculated" elements surely have "the ability to influence a consumer's decision" about how to respond, and *did* adversely influence Plaintiffs' decisions. They are thus "material," should this Court choose to adopt the materiality standard used in other Circuits. ROA.8475.

### E. Defendants' non-itemized dunning letters violate the FDCPA under any standard.

As in *Salinas*, Plaintiffs' case here does not require this Court to explicitly accept or reject the materiality standard used by other Circuits. Properly analyzed, Defendants' non-itemized letters contain false,

misleading, deceptive, and/or unfair representations that impaired Plaintiffs' ability to knowledgeably assess the alleged debts, and thus violated §1692e and §1692f of the FDCPA – under either the materiality standard or the lens of the unsophisticated consumer.

Defendants' letter to Mrs. Randolph did not even identify the basis of her alleged debt or when it was incurred, stating only: "Our client's records indicate that you have breached your Road Home Grant obligations. Those obligations are outlined in your Road Home Grant Agreement." ROA.7927. This is no clue at all because the Agreement consists of four separate documents containing myriad obligations to perform over a ten-year-and-counting span – all of which Mrs. Randolph believes she satisfied. ROA.7734-45. If Mrs. Randolph had returned to the Agreement for clarification, she would have worried about whether she had breached her obligations of occupancy, or maintaining flood insurance, or reporting her performance, for example. Nothing in Defendants' letter focused her attention on the alleged failure to report a duplicate benefit, which she might have fruitfully explored with her insurer – as undersigned counsel later did, to support argument that the debt was not even *owed*. What's more, the revelation in discovery that

Mrs. Randolph's alleged debt arose from insurance duplication establishes the fallacy of Defendants' original charge claiming breach of "obligations" – plural.  ROA.7927.

In Mrs. Calogero's case, Defendants' follow-up letter to her counsel proves the inadequacy of their initial dun. ROA.7940. Therein, Defendants changed the basis of her purported duplicate benefit (from insurance alone to FEMA relief, primarily), revealed the calculation imposing a 30% penalty (a provision that is absent from both dunning letter and grant agreement), and failed to correct their original misstatement of when the purported duplicate benefit was paid (a point which impacts whether attorneys' fees could be taxed on the threatened lawsuit). These missing, or misstated, elements of "what," "when," and "how-calculated" are exactly the type of presentation that *Fields* faulted for "leav[ing] the door open" for a consumer to "wonder" about the debt; moreover, omitting the 30% penalty is plainly "unfair" because it impermissibly "hides the true character of the debt." *Fields*, 383 F.3d 565-66. Further, Defendants' initial dun is worse than an open-door because it *misdirected* any investigation to the wrong source and wrong

timeframe to determine whether payments existed, or constituted duplicate benefits subject to repayment.

While Defendants' follow-up illustrates the deficiencies of their initial duns, it cannot cure them. *Id.* at 566 (rejecting defense that debtor could have telephoned collector for explanation); *Tourgeman,* 755 F.3d at 1122 (same, because "consumers are under no obligation to seek explanation of confusing or misleading language in debt collection letters"); *Miller*, 214 F.3d at 875 (same, finding that the FDCPA is "not satisfied by listing a phone number"). Plaintiffs did not have the basis to understand the alleged debts here until litigation was well underway – and by then Defendants had achieved the unfair advantage of extracting payment from Mrs. Randolph.

In sum, consumers are entitled to sufficient information in the initial dunning letter to knowledgeably assess the validity of an alleged debt. Defendants' omissions, misstatements, and ambiguities do not pass muster to inform this task, under any standard. Thus, granting summary judgment in favor of Defendants was wrong as a matter of law and should be reversed. Further, the undisputed factual record compels

summary judgment in favor of Plaintiffs on the issue of Defendants' liability for their failure-to-itemize claim.

## IV. The district court erred in dismissing Plaintiffs' second claim relating to Defendants' threat of legal action on time-barred claims.

The propriety of Defendants' threats to sue Road Home debtors more than a decade after they received their grants depends on which limitations period applies and when it commenced to run. The district court erred on both determinations.

### A. Misrepresenting the judicial enforceability of debts violates the FDCPA.

This Court holds that legal enforceability of a debt is "a central fact" about its character, thus misrepresentation about that fact violates the FDCPA. *Manuel*, 956 F.3d at 829, citing *McMahon v. LVNV Funding, LLC*, 744 F.3d 1010 (7th Cir. 2014); *accord, Daugherty*, 836 F.3d at 829 (finding settlement offer impermissibly implied enforceability).

Collection of old debt is not forbidden, *per se*, but a dunning letter must be examined "as a whole" to determine FDCPA compliance. *Manuel*, 956 F.3d at 831. Emphasizing that it did "not purport to catalogue all the ways" a debt collector could misrepresent stale debt, this Court faulted the *Manuel* letters for failing to warn that a statute of

limitations existed and how that statute might affect collection. *Id.*
Particularly troubling was the omission of when the debt was incurred,
which might have provided "some inkling that the debt might be too old
to be legally enforceable." *Id.*

Significantly, most collectors were expected to "know the age and
legal enforceability of a debt" because "an original creditor would know
the dates, [and] a third-party collector would be able to get that
information from the original creditor for whom it was collecting." *Id.* at
828, citing *McMahon*, *supra*. And if not, as Defendants claim was the
case here, the court offered a simple solution: "a collector who does not
know whether a debt is time-barred could 'easily include general
language about that possibility.'" *Id.*

Defendants' collection letters to Mrs. Calogero and Mrs. Randolph
contained no such language but threatened:

> Please be advised that if you do not take any action to resolve
> this matter within ninety days…Road Home may proceed
> with further action against you, including **legal action**….
> You may also be responsible for legal interest from judicial
> demand, court costs, and attorney fees if it is **necessary to
> bring legal action against you**.

ROA.7927, ROA.7029 (emphasis supplied).

This misrepresents the status of the debt by failing to state when the debt was incurred and failing to disclose the existence of a limitations period on its enforceability. Worse, Defendants – attorneys writing on law-firm stationery – indicated that the debt *was* judicially enforceable by advising that nonpayment could make legal action "necessary." Given Defendants' misleading presentation of this "central fact" about Plaintiffs' alleged debts, the district court erred in denying Plaintiffs summary judgment on their second claim.

**B. In the first appeal, this Court declined to rule on which time-bar applies to Defendants' collection activities because the factual record was not yet developed.**

Resolution of Plaintiffs' claim turns on determination of *which* time-bar applies to the collection of alleged duplicate benefits. Broadly, the question presents a choice between federal or state law; and if Louisiana law, then which provision.

Plaintiffs urge application of the six-year federal statute of limitations for collection of federal funds. That statute provides, in pertinent part:

> …every action for money damages brought by the United
> States or an officer or agency thereof which is founded upon
> any contract express or implied in law or fact, shall be barred
> unless the complaint is filed within six years after the right of
> action accrues….

28 U.S.C. § 2415(a).

Defendants argue their collection actions were governed by state law on breach of contract; they invoke the longest possible prescriptive period for a Louisiana contract:

> Unless otherwise provided by legislation, a personal action is
> subject to a liberative prescription of ten years.

LA. CIV. CODE ANN. art. 3499.

Plaintiffs counter that if state law supplies the time-bar, then it should be the five-year prescriptive period for non-performance of conditions on an onerous donation:

> An action to dissolve a donation for failure to fulfill the
> conditions or perform the charges imposed on the donee
> prescribes in five years, commencing the day the donee fails
> to perform the charges or fulfill his obligation or ceases to do
> so.

LA. CIV. CODE ANN. art. 1564.

In the first appeal of this action, this Court declined to choose which sovereign's statute of limitations would govern Defendants' collection activities, because:

the resolution of these issues is tied to factual determinations that extend beyond the complaint's allegations (i.e. the development of the Road Home Program, the federal government's involvement, and specific actions SCW used in attempting to collect the debt).

ROA.318.[30]

## C. On remand, the district court improperly relied on the factual record of another proceeding to select Louisiana's ten-year period.

On remand, Plaintiffs developed a detailed record for such determinations; the 25-volume record includes excerpts of the many documents painstakingly discovered and extracts of the many depositions taken. Significantly, Defendants have never disputed the *facts* laid out by Plaintiffs, only their consequences.

Defendants, in turn, supported their *factual* claim that the Road Home was a state-based program subject to the state's ten-year prescriptive period primarily with the following declaration made fourteen years ago by a former HUD employee, J. Kome, in another proceeding:

---

[30] The district court overlooked this instruction from this Court, and simply declared: "The LRA and the OCD are state agencies as a matter of law" (ROA.8499), which fails to reach the issue of whether these state agencies functioned as federal agents in their debt collection efforts.

> The State of Louisiana is responsible for the implementation, design, and administration of the Road Home Program in conformance with the applicable CDBG Program requirements set by HUD.

ROA.6246.

This statement is so incomplete as to be grossly misleading in the present context.  Plaintiffs objected by motion to strike it as inadmissible hearsay (ROA.7558), which was denied as moot because, the court said, it "did not need to consider this exhibit in its legal determination that the state administered the program."  ROA.8497.  The court then found that Plaintiffs "provide no summary-judgment evidence to contravene the *Napoleon* court's bottom-line conclusion that 'day-to-day governance, development, and implementation of the Road Home grant program was performed by the LRA not the federal government.'" ROA.8497, citing *Napoleon v. Shows, Cali & Walsh, LLP*, 573 F. Supp. 3d 1063 (E.D. La. 2021), *appeal denied*, No. 20-1775, 2022 WL 721560 (E.D. La. Mar. 10, 2022).

This is the crux of the court's ruling on the applicable time-bar, and it is wrong.

**1. The district court violated principles of collateral estoppel in relying on *Napoleon's* factual findings.**

The choice of statute of limitations is a question of law, but the extent of federal governance of the state's recapture program is one of *fact*. Here, the lower court impermissibly adopted *Napoleon's* factual finding that the Road Home program was essentially a state affair, in violation of the principles of collateral estoppel. *See*, *e.g.*, *Copeland v. Merrill Lynch & Co.*, 47 F.3d 1415, 1422 (5th Cir. 1995).

Plaintiffs were entitled to have the agency issue adjudged on *their* factual record, developed at this Court's instruction – *a fortiori* because they were not parties to *Napoleon*, thus unable to seek appellate review of this important decision affecting the public interest. *Id.*, *citing* Restatement (Second) of Judgments, §28 (1982). Indeed, Napoleon himself was denied review of this interlocutory ruling. Thus, the lower court's reliance on it was premature as well as improper.

Most critically, *Napoleon's* fact findings were premised on the *same* hearsay that Plaintiffs moved to strike. *See*, *e.g.*, *Napoleon*, at *1, quoting Rec. Doc. 25-2 at 69, which is Kome's declaration. For the reasons in Plaintiffs' unconsidered motion to strike (ROA.7758-73), Kome's statement was inadmissible hearsay, prepared for an entirely different

proceeding, thus its untraversed statements were unreliable for Defendants' purposes. *See*, FED. R. EVID. 804(b)(1), *Battle v. Mem'l Hosp. at Gulfport*, 228 F.3d 544, 552 (5th Cir. 2000); *Dartez v. Fibreboard Corp.*, 765 F.2d 456, 462 (5th Cir. 1985). Moreover, Kome's 2009 declaration is irrelevant because it has nothing to do with recapture of duplicate benefits or Defendants.

Also critical, *Napoleon* addressed debt arising from a Road Home elevation incentive – which is a different contract than Plaintiffs' compensation grant, and unrelated to duplicate benefits owed under the Stafford Act.

In sum, reliance on *Napoleon's* factual findings was improper because they were rooted in the same inadmissible declaration presented by Defendants in *this* case – the one the lower court here said it did not "need" in mooting Plaintiffs' motion to strike, but nonetheless *imported* through *Napoleon*. ROA.8497. These findings should be jettisoned on *de novo* review.

## 2. Day-to-day governance is not a requirement of federal agency.

*Napoleon's* legal findings should also be disregarded because they are rooted in tort principles, which led the lower court to mis-frame the issue as:

> …the question here is not whether the community action agency receives federal money and must comply with federal standards and regulations, but whether its day-to-day operations are supervised by the Federal Government.

ROA.8500, quoting *Napoleon*, at *5, citing *United States v. Orleans*, 425 U.S. 807 (1976).

Reliance on *Orleans* to deny Road Home's federal agency in the matter of grant recapture is unsound. *Orleans* was a personal injury claim arising from a children's fieldtrip sponsored by a federally-funded community center. The issue was whether the federal government could be vicariously liable for the negligence of its grantee under the Federal Tort Claims Act. Based on *tort* principles, the court found that liability could attach only where the federal government had "day-to-day" control over the physical premises at issue. *Orleans*, 425 U.S. at 814-15.

In contrast, the U.S. Government faces *no* liability in this FDCPA action. As an original creditor under the Road Home Agreement and the Stafford Act, the federal government could bring suit directly against Road Home grant recipients like Plaintiffs, and would be exempt from FDCPA liability when doing so.[31] Thus, no liability could attach to the federal government by finding that Louisiana functioned as a federal agent in recapturing duplicate benefits.

**D. The facts of record here establish the federal government's interest in duplicate benefit debt, which compels application of a federal limitations period.**

**1. The federal government is Plaintiffs' original creditor.**

The district court's confusion extended to the Road Home Agreement itself. For example, the lower court stated: "Plaintiffs expressly agreed to repay the state, not the federal government...." ROA.8499. The contract flatly contradicts this finding:

---

[31] *Perry v. Stewart Title Co.*, 756 F.2d 1197, 1208 (5th Cir. 1985), *modified on other grounds*, 761 F.2d 1197, 1208 (5th Cir. 1985) ("The legislative history of §1692a(6) indicates conclusively that a debt collector does not include the consumer's creditors...").

> Homeowner(s) may be prosecuted by **Federal**, State and/or local authorities in the event that Homeowner(s) make or file false, misleading and/or incomplete statements and/or documents. **Homeowner(s) agree to repay the Grant** in the event Homeowner(s) make or file false, misleading and/or incomplete statements and/or documents.

ROA.843, 856. While repayment is agreed, there is no specification of whom to pay, and the *federal* government is listed first in the preceding sentence.

Moreover, the Agreement repeatedly specifies that the *federal* government is the source of the grant:

> The Owner has been awarded a grant ("Grant") from the United States of America under the HUD Community Development Block Grant (CDBG) Program known as The Road Home Program....

ROA.7721, see also ROA.7726 (stating grant funded by HUD); ROA.7731 ("I understand that The Road Home program is funded by the United States of America...").

Indeed, Plaintiffs made several promises to the federal government, including:

> These Covenants shall be enforceable...by the State of Louisiana or the United States of America, and Owner hereby agrees that the State of Louisiana or the United States of America may demand repayment of Grant proceeds....

ROA.7722, and:

> Homeowner(s) further agree(s) not to hold the…United States or any other branch or agency of the state or federal government liable for their actions relating to this Grant…

ROA.7726, and:

> Homeowner(s) acknowledge that Homeowner(s) may be prosecuted by Federal, State and/or local authorities…

ROA.7731.

The district court's conclusion that Plaintiffs' "concomitant obligations are state, not federal, in character" is contradicted by the Road Home Agreement itself. ROA.8500.

### 2. Duplicate benefits are federal debt.

The lower court similarly misunderstood the State's role in duplicate benefit recapture, rejecting Plaintiffs' cited cases in which, the court said, entities "had assumed a federal role, essentially standing in the shoes of the federal government." ROA.8501. But the Road Home Agreement and governing law establish that Louisiana and the federal government *shared* the same shoes, which the federal government *owned*. Thus, the federal statute of limitations should apply. Ultimately, this choice-of-law issue is best addressed by considering *who acts for whom.*

Defendants characterized Plaintiffs' grant overpayments as "duplicate benefits" (ROA.7941), which are prohibited by the Stafford Act. When such duplication occurs, "A person receiving Federal assistance for a major disaster or emergency shall be liable to the United States…." 42 U.S.C. § 5155(c). The Act continues: "The agency which provided the duplicative assistance shall collect such duplicative assistance from the recipient in accordance with chapter 37 of title 31…." *Id.*

Title 31, in turn, addresses such "over-payments" as:

> any amount of funds or property that has been determined by an appropriate official of the Federal Government to be owed to the United States by a person….

31 U.S.C. § 3701(b)(1). Here, as required by the original HUD-approved Action Plan, *OCD* (through its contractor ICF) identified duplicative "overpayments" – which led to the debt collections that resulted in the instant action. ROA.2441, 4838, 7324-25, 7837, 7841. In doing so, *OCD* acted as an "official of the Federal Government" to fulfill its recapture obligations owed to HUD.

The district court focused on state law, suggesting that OCD could not be a federal agency because *Louisiana* law requires such collection. ROA.8497, citing LA. STAT. ANN. § 49:663.1(D), which provides:

> The office of community development disaster recovery unit shall recover funds improperly paid to or misspent by recipients…

But §49:663.1 proves Plaintiffs' point: Louisiana has been delegated – and accepted – responsibility to recoup duplicate benefits owed to the U.S. government. As HUD explained: "Under the Stafford Act, a Federal agency that provides duplicative funds must collect those funds." 76 Fed. Reg. 71066. HUD continued: when CDBG disaster recovery funds unknowingly create a duplication, then recapture is "the responsibility of the grantee." *Id.* Legislative history of §49.663.1 confirms its genesis was to address OCD's execution of HUD-mandated debt collection.[32]

---

[32] *See, Hearing before the Select Committee on Hurricane Recovery*, 2014 La. Sess. (March 6, 2014) (testimony of OCD's counsel and LRA director regarding grant recapture efforts required by HUD and Louisiana's actions taken to comply, including pursuing both collection from homeowners and suing ICF for its mismanagement that resulted in grant overpayments; statement of Senator J.P. Morrell, introducing bill to amend La. R.S. 49:663.1); video available from Louisiana Senate Archives, *see especially*, 32:45"-45:20", at:
https://senate.la.gov/s_video/videoarchive.asp?v=senate/2014/03/030614HURRICANE.wmv.

In addition, the State's own MOU described OCD as "the fiscal agent responsible to [HUD] in all fiscal matters" (ROA.6333, ¶6(f)), and the Louisiana Office of State Procurement certified Defendants' debt collection contract as "100% FED HUD CDBG $...GRANT RECOVERY." ROA.6700. As testified to Congress, HUD audited the State "over 52 times" during the first two years of Road Home administration, and periodically thereafter. As the result of one audit, the inspector general required the State to return nearly $5 million to HUD. ROA.6351-53. Defendants were likewise monitored by HUD, which paid for their collection services and their computer software.  ROA.6668, 6674-75. Ultimately, any funds recaptured by Defendants are returned to federally-directed objectives or the U.S. Treasury. ROA.5979, 6337, 6667.

Plainly, Louisiana acted on behalf of the U.S. Government to identify and collect duplicate benefits owed to the federal government.

### 3. In prosecuting Road Home claims directly, the federal government called Louisiana and its contractors "agents" of HUD.

The federal government may – and did – act on its own behalf to recoup its funds, for example, by prosecuting cases where fraud was suspected. ROA.6308-09. Indeed, in the eyes of the U.S. Attorney, all

Louisiana entities handling Road Home administration, were "agents" of HUD, as evident from his allegation that a homeowner:

> did knowingly and willfully make a false, fictitious and fraudulent statement and representation as to a material fact in a matter within the jurisdiction of the United States to the United States Department of Housing and Urban Development, an agency of the United States, **and its agents**, in that he applied for a Louisiana Road Home grant and received $119,935 for repairs to property...

ROA.6747-48 (emphasis supplied); *see also*, ROA.6746-47 (reciting relationship of HUD to Louisiana and its contractors for disbursement of federal grant funds).

It is undisputed that the federal government may pursue civil debt collection as well as criminal prosecution. Further, no one disputes that the federal statute of limitations, 28 U.S.C. § 2415, would apply to such collection activity undertaken directly by the federal government. Critically, neither Defendants nor the lower court identify any basis for applying a different period when a state acts on behalf of the federal government for such collection.

### 4. The U.S. Supreme Court recognizes non-federal administrators of HUD-CDBG grants as federal agents, subject to federal law.

The case most relevant to the instant matter is *Dixson v. U.S.*, 465 U.S. 482 (1984), where the Supreme Court recognized that non-federal administrators of HUD-CDBG grants may act as "quintessentially" federal agents, making them subject to federal law. The grants at issue in *Dixson* were awarded to the City of Peoria, which in turn awarded them to a local organization that was placed "in charge of the administration of the federal block grant funds." *Id*. at 500. The organization hired Dixson; he was later indicted on federal bribery charges.

In his defense, Dixson argued that he was not a federal official and thus not subject to federal charges. The Supreme Court disagreed:

> [Dixson] had operational responsibility for the administration of the [HUD] grant program within the city of Peoria. In allocating the federal resources made available to the city through the [HUD] grant program, [Dixson] assumed the quintessentially official role of administering a social service program established by the United States Congress.

*Id*. at 497.

Here, too, the State of Louisiana was charged with operational authority for the administration of HUD's grant funds appropriated by

Congress – as Defendants insist and the lower court agreed. Under *Dixson*, it follows that OCD "assumed the quintessentially official role of administering a social service program established by the United States Congress" and is therefore subject to the federal statute of limitations for collecting debts arising from that program.

### 5. Federal statutes of limitation apply when the federal government maintains an interest in the funds, as here.

The district court's error in finding that Plaintiffs' obligations were "state, not federal, in character" caused it to reject, wrongly, the line of cases applying §2415 to federal debt. ROA.8500-01. But federal law, HUD's constant oversight and command of the funds, the Road Home Agreement, and the DOJ prosecutions all confirm that the federal government *does* maintain its interest in alleged duplicate benefits. According to the following cases, §2415 thus applies, without any requirement of "day-to-day" management found to be determinative by the lower court.

For example, *United States v. Thornburg* applied §2415 to a private bank attempting to collect a debt for the federal government, reasoning that "it was appropriate to apply the common law principle that an assignee stands in the shoes of the assignor with regard to the applicable

statute of limitations." 82 F.3d 886 (9th Cir. 1996), citing *FDIC v. Bledsoe*, 989 F.2d 805 (5th Cir. 1993). Its analysis focused on the fact that the U.S. maintained an interest in the debt:

> … the United States did not sell its right to collect money due on the Note and personal guaranty to the assignee. Instead, the SBA assigned the Note…. to the Bank solely for the purpose of attempting to collect money owed… An assignment for collection purposes presents an even more compelling situation for the application of the common law rule… The United States did not divest itself of its right to bring an action to collect the unpaid balance of the loan in appointing the Bank to act as its surrogate…

*Id*. at 891-92 (cleaned up). Because the bank "stood in the shoes" of the federal government, §2415 applied to its collection activities.

Here, the State and HUD share the same pair of shoes, courtesy of the concomitant obligations created by the Road Home Agreement and their coordinate Stafford Act duties. And, because the funds were federal upon appropriation and federal upon return to the Treasury, those shoes are owned by the federal government. Thus, like the bank in *Thornburg*, Louisiana "stands in the shoes" of the federal government with respect to duplicate benefit recapture.

Policy considerations reach the same result, as illustrated by a case rejecting the idea that "the government's interest in recovery of wrongly paid Medicare should be dependent on an insured's state of residence." *Manning v. Utils. Mut. Ins. Co.*, 254 F.3d 387, 397 (2d Cir. 2001). Instead, the court ruled, "[t]he federal interest in recovering monies erroneously paid by Medicare is better served by uniformly adopting the six-year limitations period applicable to private claims brought pursuant to the [False Claims Act]." *Id.* The court further noted that this would "bring into conformity the limitations period" applicable to other government actions. *Id.*

*Manning's* concern for uniformity echoes that expressed by Congress in enacting §2415, discussed *infra*.

### E. The federal statute of limitations, 28 U.S.C. § 2415, preempts state periods here.

The district court did not address Plaintiffs' argument on preemptive effects of federal law, premised on *Castro v. Collecto, Inc.*, 634 F.3d 779, 784 (5th Cir. 2011).[33]  ROA.6286-93.

---

[33] Louisiana law looks to federal law to determine choice-of-law issues between sovereigns. LA. CIV. CODE ANN. art. 3516, comment (1991).

As here, *Castro* was an FDCPA case involving choice of federal or state limitations periods. Applying preemption principles, it considered whether collection of a phone bill was time-barred by the Federal Communications Act or Texas contract law – a determination which depended on whether Congress' de-regulation of telecommunications included billing practices. The court parsed the issue finely, distinguishing between "tariffed charges" (subject to federal period) and "non-tariffed charges" (subject to state period), to determine whether Congress intended *its* policy to replace that of the states for a particular issue. *Id.*

The plain language of 28 U.S.C. § 2415 supports a finding of express preemption here. Section 2415 applies to "every action for money damages brought by the United States or an officer or agency thereof which is founded upon any contract." The undisputed facts establish that Louisiana functioned as such an "officer or agency thereof" in its collection of HUD's funds, so that these collection activities are governed by §2415.

The legislative history of §2415 also supports preemption given that the "principal basis" for adoption of §2415 was the need for "fairness,"

because "persons dealing with the Government should have some protection against an action by the Government when the act occurred many years previously." S. REP. NO. 1328 (1966); *accord*, H.R. REP. NO. 1534 (1966) (collectively, "History").

Congress' choice was based, in part, on the report from the Comptroller General of the Government Accounting Office: "Viewed in the light of our audit experience…a period of 6 years would appear sufficient to adequately safeguard the Government's interest." History, *supra*. Both chambers acknowledged the "variety" of limitations periods existing among the States, noting: "the objective of [§2415] would be to provide a fair procedure which would have the effect of ending the possibility of contracts litigation after a fixed period." *Id.* Both chambers reiterated:

> It is also clear that the enactment of this bill will not subject an agency of the United States, including a corporation, to any State statute of limitations.

*Id.*

Also, grounds for implied preemption exist because the federal interest in the field of disaster relief is so dominant that it precludes state

laws which could impede Congressional objectives – as state limitations periods shorter than six years would do here.

For example, the U.S. Supreme Court recognizes that exercise of the federal spending power for disaster relief has "its origin in the Constitution and the statutes of the United States." *Clearfield Trust Co. v. U.S.*, 318 U.S. 363, 366 (1943).   In selecting federal law for the recoupment of mis-paid relief funds, the Court explained:

> Applying state law would lead to great diversity in results by making identical transactions subject to the vagaries of the laws of the several states. The desirability of a uniform rule is plain.

*Id.* at 367.

Here, the lower court's selection of state law presents the specter that recoupment timeframes will vary – even among those states allocated CDBG funds by the same Congressional appropriation for the same federal objectives of recovery from the same disaster.[34]

This is unfair to both victims and taxpayers. For example, Katrina made landfall at the Louisiana-Mississippi border, and the HUD-CDBG funds at issue were allocated to both states. 119 Stat. 2780. The district

---

[34] *See*, Addendum, sampling variety of states' limitation periods.

court's ruling means that Louisianans are exposed to recapture actions for ten years under Civil Code Article 3499, whereas Mississippians are vulnerable for only three years per Miss. Code Ann. § 15-1-49.

This variation also unfairly jeopardizes the federal fisc because, under the lower court's ruling, the period for duplicate benefit recapture will be curtailed to a period shorter than six years in some states – for example, halved in Mississippi. Given the Comptroller General's report, periods shorter than six years may not be "sufficient to adequately safeguard the Government's interest." H.R. REP. NO. 1534, at 4. Because state periods shorter than six years (*e.g.*, Mississippi) would impede collection of duplicate benefits owed to the U.S. Government under the federal Stafford Act, they should be preempted by §2415.

In sum, preemption analysis supports application of the federal statute of limitations here.

### F. If Louisiana law governs, then Article 1564's five-year prescriptive period for non-performance of conditions on an onerous donation applies.

Louisiana has not asserted any policy objectives in having its prescriptive periods favored here. However, if this Court finds state law applies, then the five-year period of Article 1564 governing the breach of

onerous-donation contracts is more appropriate than the ten-year period of Article 3499 for breach of an innominate contract.

Selection of the Louisiana period should be based on the nature of the right being enforced. *Merchants Nat. Bank & Tr. Co. of Indianapolis v. Smith, Hinchman & Grylls Assocs., Inc.*, 876 F.2d 1202, 1206 (5th Cir. 1989) (refusing to apply Article 3499 when a more specific article governed the action). However, the district court failed to recognize the nature of the alleged debts arising from Plaintiffs' grant contracts, ruling:

> …**recipients of the grant monies were required** to demonstrate eligibility for the Road Home grants and **to enter into obligations concerning their receipt and use of the monies. Hence… the grants do not constitute donations but are contracts** governed by the ten-year prescriptive period of article 3499.

ROA.8503 (emphasis supplied).

However, donations and contracts are not mutually exclusive under Louisiana law, and this characterization proves that Road Home Agreements *are* onerous-donation contracts, thus Article 1564 should apply.

Civilian doctrine provides: "Donation is a contract; it creates obligations…." Planiol, 3 TREATISE ON THE CIVIL LAW, Pt. 2, No. 2579, p. 262; *see also*, LA. CIV. CODE ANN. art. 1468. A donation that includes

conditions converts it to an "onerous" donation. *Howard v. Adm'rs of the Tulane Educ. Fund*, 07-2224 (La. 7/1/08), 986 So. 2d 47, 55, citing Articles 1519, 1527. The donee is then "bound to execute the charges or obligations imposed on him by the act of donation in the same manner and to the same extent as the debtor in any ordinary contract." *Voinche v. Town of Marksville*, 50 So. 662 (La. 1909).  In case of breach, a donation may be revoked for non-performance of conditions. LA. CIV. CODE ANN. art. 1556; *DiMattia v. DiMattia*, 282 So. 2d 554, 557 (La. App. 1 Cir. 1973).  The time limit for doing so is five years, pursuant to Article 1564.

The Road Home Agreement imposed precisely such obligations subject to revocation of the grant for breach. Grant recipients agreed to reside in the home for at least three years, purchase flood insurance, and return duplicate benefits (if any), and more. ROA.7721-32, *see especially* where Plaintiffs averred:

> I/we agree to comply with the terms, covenants, and conditions contained in the Covenants and the Grant Agreement, and acknowledge that failure to comply with the Covenants or the Grant Agreement may result in an obligation to pay back all of the Grant.

ROA.7731, ¶4.

As addressed more fully in memorandum of record, ROA.6315-19, Road Home compensation grants were onerous donations under Louisiana law. So, if state law applies, Plaintiffs' alleged failure to satisfy the condition of repaying duplicate benefits was governed by the five-year period of Civil Code Article 1564, which accrued many years before Defendants dunned Plaintiffs.

## G. Regardless of which time-bar applies, that period began to run upon breach of the Road Home agreement.

Having selected a state prescriptive period to apply to Defendants' collection activities, the district court then considered Louisiana's doctrine of *contra non valentem*. Reserved for exceptional circumstances, this doctrine suspends commencement of prescription until constructive notice of breach. Constructive notice is that sufficient to excite attention and call for inquiry; it requires the complainant's reasonable diligence, and is tantamount to notice of everything to which inquiry may lead. *Campo v. Correa*, 01-2707 (La. 6/21/02), 828 So. 2d 502, 210-11.

The relevant facts are these: At grant application, Mses. Calogero and Randolph allegedly did not disclose all payments received from insurance and FEMA. The allegedly omitted payments were not used in the calculation of their grants, resulting in the purported overpayments

that Defendants sought to collect. In 2007, through a datafeed created by the State and maintained by its contractor ICF, Plaintiffs' insurer and FEMA reported to the State their payments made to Plaintiffs. In 2008, the State, through ICF, reviewed this data and determined Plaintiffs had received potentially duplicative payments.

The issue is whether receipt-of-data or review-of-data provided the State with sufficient notice to "excite inquiry" into the potentially duplicative payments. In selecting the later date, the court failed to recognize that electronic notice is notice, and further failed to recognize that the State was imputed with its contractor's knowledge.

First, the notion of tying notice to "the face of physical records," as the district court did, is long outmoded. Decisional law of this Court does not become binding only upon Westlaw query. Nor do appeal delays commence only when counsel's secretary downloads notice from CM/ECF.

Given the scale of Road Home, any paper-based communication would be so inefficient as to constitute governmental malfeasance. Indeed, while Defendants produced hard copies of eGrants files to Plaintiffs so that *they* could access the data, there is no indication that *the State* accessed it by any means other than electronically. Thus, the

district court's notion that the existence of this information "somewhere in the ether does not excite the attention of anyone" is unfounded. ROA.8507. Besides, Plaintiffs' payment information was not random data on the world-wide-web. Rather, this information arrived via the datafeed intentionally established to enable the State to recapture duplicate benefits owed to the federal government. Given that such recapture was a prerequisite to obtaining federal funds, the State knew – or *should have known* – of this data transmitted into the system it created to receive it.

After all, suspension under *contra non valentem* terminates at constructive notice, and may be invoked only by one who exercises "reasonable diligence." *Campo*, *supra*. By stretching notice to suspend prescription until the State eventually reviewed that notice months later, the court allows a creditor to forgo diligence altogether. This creates a perverse incentive for the State to artificially extend the prescription deadline by delaying when it "opens the envelope" of the notice it receives. This violates the doctrine by, first, excising its diligence component altogether; and, further, by extending suspension from the event that "excites inquiry" to the event documenting the "results-of-inquiry."

Additionally, the district court was troubled by the involvement of a "third-party" contractor at the time of data transmission in 2007. ROA.8506. However, it accepted that *same* contractor's involvement in the March 2008 activity it found sufficient to commence prescription. ROA.7324-25.  At all pertinent times, the relevant actor was ICF, retained by the State to administer the entire Road Home program.  And, for purposes of notice, contractors like ICF *were the State* because an agent's knowledge is imputed to its principal.[35]

## H. Plaintiffs' debts prescribed before Defendants' collection actions.

Properly analyzed, the case of Plaintiff Calogero is proof-positive that Defendants violated the FDCPA by threatening legal action on time-barred debt. Through OCD's system, FEMA's reported payment of an additional $5,300 to Mrs. Calogero came into OCD's data warehouse on July 3, 2007.  State Farm's report of additional payments arrived in the data warehouse on August 5, 2007.  These are the proven dates of entry

---

[35] *See*, *Ishee v. Fed. Nat'l Mortg. Ass'n*, 641 F. App'x. 438, 442, n. 4 (5th Cir. 2016) (agency imputes knowledge even when it is not directly communicated by agent to principal); *Thomas v. N.A. Chase Manhattan Bank*, 1 F.3d 320, 325 (5th Cir. 1993) ("It is a basic tenet of the law of agency that the knowledge of an agent…is imputed to the principal"); *Martin v. Schwing Lumber & Shingle Co.*, 81 So. 2d 852, 854 (La. 1955) (corporation bound by the knowledge acquired by its agents); *see also*, ROA.8185-86.

into the data warehouse, not merely receipt via datafeed. Thus, prescription commenced to run against any claim for recapture of FEMA payment sometime before July 3, 2007, and for recapture of insurance payment sometime before August 5, 2007. Those claims prescribed by July 4 and August 6, 2017, respectively. ROA.6129, 6849, 7814, 8096.

Defendants dunned Mrs. Calogero on February 9, 2018 – more than six months *after* the debts had prescribed under the ten-year period of Article 3499.[36]

The district court's mistake regarding when the State was on notice obscures *Defendants'* bolder claim that *they* lacked knowledge of when prescription began to run – because they never asked. ROA.6339. Defendants knew only that Plaintiffs' grants had been disbursed in 2007, which should have alerted them to time-bar issues upon dunning them in 2017-2018. Despite this Court's counsel for such circumstances, Defendants made no mention of such possibility in their dunning letters to Plaintiffs. *Manuel*, 956 F.3d at 828.

---

[36] Under the same analysis, Defendants' letter to Mrs. Randolph issued a few weeks *before* the ten-year limitation had run, but *years after* the shorter periods of 28 U.S.C. § 2415 or La. Civ. Code Ann. art. 1564 had accrued.

In sum, the district court erred in selecting Article 3499 as the applicable limitations period, and further erred in suspending prescription until the State acted on the notice it had received months earlier. Correcting either, or both, of these determinations establishes that Plaintiffs' alleged debts were time-barred at the time of Defendants' collection efforts, which in turn confirms that Defendants misrepresented the legal enforceability of Plaintiffs' alleged debts by threatening to take legal action. Threatening suit on time-barred debt violates the FDCPA and warrants entry of summary judgment in favor of Plaintiffs on their second claim.

## V. The district court erred in dismissing Plaintiffs' third claim by improperly finding that Defendants had a right to threaten recovery of attorneys' fees from Plaintiffs.

The FDCPA governs whether and how a debt collector may threaten a consumer with liability for additional fees and charges related to collection. *See, e.g.*, §§ 1692e(2)(B), e(5), e(10), 1692f(1), reproduced in Addendum.

To date, this Court has not addressed a threat of shifting attorneys' fees under the FDCPA. However, it has recognized FDCPA violation where a debt collector uses language "that would mislead an

unsophisticated consumer into believing the debt is legally enforceable," such as time-barred debt. *Daugherty*, 836 F.3d at 513, quoting *McMahon,* 744 F.3d at 1022.

The national FDCPA jurisprudence recognizes that this principle of forbidding unlawful pressure to extract payment extends to threats to tax unauthorized attorneys' fees. As one court explained, debt collectors are forbidden from even implying that "certain outcomes might befall a delinquent debtor when, legally, those outcomes cannot come to pass." *Lox v. CDA, Ltd.*, 689 F.3d 818, 825 (7th Cir. 2012) (finding FDCPA violated by threat of unauthorized attorneys' fees); *accord*, *McCullough v. Johnson, Rodenburg & Lauinger, LLC*, 637 F.3d 939, 949 (9th Cir. 2011); *Foster v. DBS Collection Agency*, 463 F. Supp. 2d 783, 802 (S.D. Ohio 2006).

Defendants' dunning letters to Plaintiffs warned:

> Please be advised that if you do not take any action to resolve this matter within ninety days… Road Home may proceed with further action against you, including legal action… You may also be responsible for legal interest from judicial demand, court costs, **and attorney fees** if it is necessary to bring legal action against you.

ROA.7927, 7929 (emphasis supplied).

Defendants' language tracks that considered in *Lox*, which the Seventh Circuit analyzed this way:

> There is only one reasonable interpretation of [the debt collectors'] attorney fees language: that a lawsuit is a possible outcome of nonpayment, and that attorney fees are a possible outcome of a lawsuit.

689 F.3d at 825. Where that statement is false, or only conditionally true, it violates the FDCPA because it may pressure the unsophisticated consumer into making payment under misleading pretenses. *Id.* Indeed, Defendants' threat of attorneys' fees coerced Mrs. Randolph into signing a note for the claimed debt, which she did not believe she owed. ROA.2578.

Thus, the question presented by Defendants' dunning letters is whether attorneys' fees could be taxed against Plaintiffs Calogero and Randolph in a suit on the alleged debts.

## A. Defendants relied on contractual authorization – only – for fee-shifting.

Louisiana law disallows attorneys' fees except where authorized by contract or statute. *Maloney v. Oak Builders, Inc.*, 235 So. 2d 386, 390 (La. 1970). As this Court observed in the first appeal, Defendants rely on the Limited Subrogation/Assignment Agreement ("LSAA"), one of four

instruments that comprise the Road Home Agreement, as the basis for their collection efforts. ROA.314.

On remand, Defendants continued to rely on the LSAA; they responded to multiple interrogatories by stating:

> Defendants believe that the contract entered into with the grantees provide for the collection of attorney's fees, particularly the Road Home Limited Subrogation/Assignment Agreement, and was [sic] unaware of any court decisions to the contrary.

ROA.7936. Defendants never asserted any other authority for fee-shifting.

Discovery revealed that Plaintiffs' purported duplicate benefits were paid *before*, not after, grant closing. ROA.2443. The dates of payment are undisputed. However, this revelation undermines Defendants' reliance on the LSAA because that instrument covers only pending claims, future rights, and payments received *after* grant closing.

The parties brought cross-motions for summary judgment on this issue of contract interpretation. ROA.2436, 6230. To be clear, the parties do not dispute the governments' right to recoup duplicate benefits paid *prior* to closing. Other instruments signed at closing undeniably provide for such recoupment; in particular, the Grant Agreement (ROA.7726) and

the Grant Recipient Affidavit (ROA.7731).   However, neither of *these* instruments authorize fee-shifting. Thus, any authority for the fee-shifting threatened by Defendants would derive solely from the LSAA, which provides:

> … I/we hereby assign to the State of Louisiana… all of my/our claims and future rights to reimbursement and all payment hereafter received or to be received by me/us (a) under any policy of casualty or property damage insurance or flood insurance on the residence, excluding contents… (b) from FEMA, Small Business Administration, and any other federal agency, arising out of physical damage to the Residence caused by Hurricane Katrina…
>
> ***
>
> In any proceeding to enforce this Agreement, the State shall be entitled to recover all costs of enforcement, including actual attorney's fees and court costs.

ROA.7728-29.

The parties did not plead, prove, or defend any other basis for fee-shifting.

## B. The district court misinterpreted the Road Home Agreement.

### 1. Clear contract language precludes judicial theorizing about the parties' intent.

The district court addressed three angles. First, it considered Defendants' argument that the suite of documents comprising the Road

Home Agreement "work in concert," but concluded it "need not employ this rationale to resolve the Plaintiffs' attorney's-fee claim." ROA.8519.

The district court correctly recognized the weakness of Defendants' argument, lacking any authority save one, now abrogated, case for the proposition that multiple instruments arising from one transaction may be construed together. ROA.8517, citing *Robinson v. Marks*, 30 So. 2d 200 (La. 1947). However, the more contemporary rule, enacted in 1985, limits such interpretation of multiple instruments to "doubtful" provisions. LA. CIV. CODE ANN. art. 2053. Plaintiffs maintain that the language here is *not* "doubtful," but is instead clear and unambiguous, rendering it unnecessary – and improper – to transfer terms from one instrument to another in pursuit of the purported intent of the parties. *See*, ROA.2593-2614, 4943-53.

The district court's intuited intent fails because equally plausible rationales *against* fee-shifting exist. For example, given the desperation of post-Katrina Louisiana, HUD and the State may have determined that storm victims should not be strapped with attorneys' fees in addition to refunding pre-closing payments. It also makes perfect sense that attorneys' fees would be restricted to the two circumstances for which

they are *expressly* provided: 1) against a losing homeowner who wrongly bit the hand that fed him, as provided in the Grant Agreement (ROA.7726); and 2) against a homeowner who received payments *after* accepting a grant but refused to remit the duplication under the LSAA; such an action has a tenor of willfulness that is absent from the recoveries at issue here (ROA.7728-29). The fact that arguments exist for either approach demonstrates the peril of courts' reading their own views into contracts, rather than considering the unambiguous language of the parties.

The district court abandoned other tenets of contract interpretation, too. For example, reading the LSAA clause to authorize the recovery of fees in every action authorized by any provision in any of the Road Home documents, as the court did, renders superfluous the more limited attorneys' fee provision of the Grant Agreement, also inapposite here. ROA.7726. Louisiana's rules of contract interpretation foreclose this result. *Naquin v. Elevating Boats, L.L.C.*, 817 F.3d 235, 239 (5th Cir. 2016).

At bottom, the district court's conjecture about the contracting parties' intent is forbidden in the absence of textual ambiguity, which simply does not exist here.  LA. CIV. CODE ANN. art. 2046.

### 2. Extinguished claims cannot be transferred.

The district court then turned to a second rationale for utilizing the LSAA's attorneys-fee provision.  Before looking at the lower court's interpretation of the term "claim," it is important to recognize that this term appears four times in the LSAA. The three instances ignored by the district court clearly consider a *future* circumstance:

o "I/we hereby agree that the State's written consent shall be required to **settle any claim**...."

o "In the event that I/we choose to **abandon, dismiss, or release the claims** against my insurance company...."

o "I/we agree to assist and cooperate with the State should the State elect to pursue any of the **claims I/we have** against the insurers...."

ROA.7728, ¶¶ 5,6 (emphasis supplied).

The district court addressed only the fourth instance, which appears in the first paragraph, ROA.7728:

> … I/we hereby assign to the State of Louisiana… all of my/our **claims** and future rights to reimbursement and all payment hereafter received or to be received by me/us..

The court misinterpreted "claims" in this clause to include assignment of *already paid* insurance claims, such as those paid by State Farm to Mses. Calogero and Randolph nearly two years before they signed their grant agreements. ROA.8520-22. This is impossible because already-paid claims are extinguished obligations, which are insusceptible to assignment or subrogation.

The Louisiana Insurance Code defines "insurance" as "a contract whereby one undertakes to indemnify another or pay a specified amount upon determinable contingencies…" LA. STAT. ANN. § 22:46(13)(a). The Code does not define "claim," but the dictionary defines "insurance claim" as: "[a] policyholder's formal report to an insurance company about a loss with a request for a payment based on the insurance policy's terms." BLACK'S LAW DICTIONARY (11th ed. 2019).

It is undisputed that State Farm paid Mses. Calogero and Randolph prior to their respective grant closings. In other words, the insurer performed its contractual obligation owed to each insured under their policies with respect to those payments made. Or, in Louisiana's parlance, "performance by the obligor extinguishe[d] the obligation." *Sullivan v. Sullivan*, 42,923, (La. App. 2 Cir. 2/13/08), 976 So. 2d 329,

335, citing LA. CIV. CODE ANN. art. 1854; *accord*, *Taylor v. Taylor*, 24 So. 2d 74, 75 (La. 1945).  And, in the context of insurance:

> …the Court finds [the insurer's] payment to [insured] of $130,156.94 constituted partial performance of its obligation to pay contents losses, thereby extinguishing the undisputed portion of the obligation to pay contents damages.

*Melba Terry Shelton Succession v. Encompass Indem. Co.*, 60 F. Supp. 3d 722, 729 (W.D. La. 2014). Thus, State Farm's $2,500 payments to each Plaintiff – the amounts the State sought to recapture as allegedly duplicate payments – extinguished these particular claims prior to grant closing.

The district court's failure to recognize that Plaintiffs' already-paid claims were extinguished led it to conclude, erroneously, that the State had acquired rights under the LSAA that no longer existed.  However, a "subrogee acquires no greater rights than those possessed by its subrogor and is subject to all limitations applicable to the original claim of the subrogor." *Gray Ins. Co. v. Old Tyme Builders, Inc.*, 03-1136, (La. App. 1 Cir. 4/2/04), 878 So. 2d 603, 607 (collecting cases). Likewise, it is "well-established that an 'assignor can assign no better rights than he has, and the assignee, of course, acquires no better rights than the assignor has.'" *Fed. Ins. Co. v. Cmty. State Bank*, 905 F.2d 112, 116 (5th Cir. 1990),

quoting *P.P. Williams & Co. v. Roach*, 125 So. 465, 468 (La. App. 1929). Simply put, one cannot transfer something one does not have. Thus, neither Mrs. Calogero nor Mrs. Randolph could – or did – assign or subrogate their already-paid, extinguished claims.

This reading is also borne out by the "consistent usage" canon of interpretation, which assumes that a word will have the same meaning throughout a text. *Landry's, Inc. v. Ins. Co. of the State of Pa.*, 4 F.4th 366, 370 (5th Cir. 2021), citing ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, 170 (2012). The postures of settlement, abandonment, dismissal, and release in paragraphs 5 and 6 of the LSAA all speak to pending or future dispositions – as they must, given that already-paid claims are extinguished and therefore not susceptible to assignment or subrogation. ROA.7728. It follows, then, that "claim" has the same future-oriented meaning in the first paragraph considered by the lower court. Indeed, read in its full context, the meaning is even clearer: "I/we hereby assign… all of my/our **claims** and **future rights** to reimbursement and all payment **hereafter received** or **to be received** by me/us…" ROA.7728, ¶1. The district court's contrary interpretation of "claims" to include past

payments introduces impermissible conflict with the other usages of the term "claim" in the same document.

Lastly, since contract interpretation is intended to discern the intent of the *parties*, it is useful to examine how the State (a party to the contract but not a party here) treats this provision. In a separate action, the State defined the class comprised of Road Home assignors/subrogors as:

> All current and former citizens of the State of Louisiana who have applied for and received or will receive funds through the Road Home Program, and who have executed or will execute a subrogation or assignment in favor of the State, and to whom insurance proceeds **are due and/or owed** for damages sustained to any such recipient's residence as a result of any natural or man-made occurrence associated with Hurricanes Katrina and/or Rita under any policy of insurance.

*In re Katrina Canal Breaches Litig.*, 613 F.3d 504, 508 n. 2 (5th Cir. 2010) (emphasis supplied). This language limits assignment to outstanding claims, confirming that not even the drafter of the LSAA envisioned assignment of already-paid insurance proceeds.

The court's erroneous finding that Plaintiffs had assigned extinguished claims led to its erroneous conclusion:

the state is entitled to seek attorney's fees pursuant to the Limited Subrogation/Assignment Agreement on any action regarding such claims, including an action to recoup the payments Plaintiffs failed to disclose before closing.

ROA.8522. However, the State acquired no such rights from Plaintiffs because their already-paid claims were extinguished, and thus insusceptible to assignment or subrogation.

To be sure, the *Road Home Agreement* and the *Grant Recipient Affidavit* plainly authorize the government to recoup duplicate benefits paid *before* closing – but equally plain is the absence of any fee-shifting authority for such recoupment. ROA.7726, 7731. Given the undisputed dates of Plaintiffs' pre-closing receipt of purported duplicate benefits, Defendants' collection efforts against them could not have been pursuant to the *LSAA* and its fee-shifting clause, and therefore Defendants had no contractual authority to threaten to tax attorneys' fees against Plaintiffs here.

## C. The district court impermissibly adopted, *sua sponte*, its own ground for summary judgment: hypothetical fraud.

The district court violated summary judgment strictures by injecting, *sua sponte* and without notice, an unpled, unproved – *and non-existent* – basis for fee-shifting: "the possibility Defendants could recover

attorney's fees in a claim for fraud concerning Plaintiffs' omissions from their grant application disclosures." ROA.8522.

The district court itself recognized that the issue of whether Plaintiffs were guilty of fraud in confection of their Road Home agreements "[w]as not before the Court." ROA.8525. Nonetheless, the court failed to comply with the following mandate governing summary judgment independent of the parties' motions:

> **After giving notice and a reasonable time to respond, the court may**:
>
> (1) grant summary judgment for a nonmovant;
>
> (2) **grant the motion on grounds not raised by a party**;
>
> or
>
> (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.

FED. R. CIV. P. 56(f) (emphasis supplied).

This Court "strictly enforce[s] the notice requirement" of Rule 56. *D'Onofrio*, 888 F.3d at 210, citing *Leatherman v. Tarrant Co. Narcotics Intelligence Unit*, 28 F.3d 1388, 1397-98 (5th Cir. 1994), which in turn explains:

> The strict enforcement of the notice requirement is necessary because a summary judgment is a final adjudication on the merits. Since a summary judgment forecloses any future litigation of a case the district court must give proper notice to insure that the nonmoving party had the opportunity to make every possible factual and legal argument.

quoting *Powell v. United States*, 849 F.2d 1576, 1579 (5th Cir. 1988) (cleaned up).

Here, the district court gave no notice whatsoever before adopting its own "theory of fraud" as an additional ground for granting summary judgment in favor of Defendants. ROA.8525. This omission is particularly troubling given that the court denied Plaintiffs' request for oral argument, forgoing an opportunity to debate its theory. ROA.2622. And, also *sua sponte*, the court reset the submission date of Plaintiffs' motion – after Defendants missed their opposition deadline. ROA.4851.

Most critically, where lack of notice "deprived the non-moving party of the opportunity to collect and submit summary judgment evidence, the error is not harmless." *D'Onofrio*, 888 F.3d at 211. Here, had Plaintiffs received notice of the lower court's theory, they would have at the very least filed the relevant deposition testimony of Defendants in opposition. Although Plaintiffs were not granted leave to supplement the record

before this Court with this evidence,[37] its existence nonetheless establishes that the district court's failure to provide the requisite notice was not harmless. *Id.*, *Leatherman*, 28 F.3d at 1398.

In addition, Plaintiffs would have argued that the FDCPA does not tolerate a mere "possibility" as justification for threats that influence a consumer's response – as fee-shifting does, and did here. *Lox*, 689 F.3d at 827 (fee-shifting is "undoubtedly" a factor in consumer's decision-making process); ROA.2578, 2582. And, given that a threat can violate the FDCPA even when it is literally true, it follows that a threat premised on a hypothetical "possibility" as suggested by the lower court surely violates the FDCPA. *Heredia,* 942 F.3d at 815; *Gonzales*, 660 F.3d at 1062.

In fact, fraud was not even a possibility against Mrs. Calogero or Mrs. Randolph or any of the other thousands of Road Home recipients who were *not* referred to the U.S. Department of Justice for prosecution. The parties did not address fraud because suspected instances of fraud committed by Road Home grant recipients were criminally prosecuted by the U.S. Department of Justice. *See*, ROA.6308-09 (referencing several

---

[37] *See*, Order, 11/30/2022, denying Plaintiffs' Motion to Supplement the Record.

examples of fraud prosecutions on the docket of the U.S. District Courts for Louisiana).  Needless to say, neither Mrs. Calogero nor Mrs. Randolph was so prosecuted. Also, as Defendant Cali testified, the State decided to pursue ICF "rather than punish homeowners" for overpayments since homeowners were *not* "trying to pull any kind of a fraud." ROA.917-18. Cali further testified in 30(b)(6) deposition of SCW:

> Counsel: Have you pursued any grantees for alleged fraud?
>
> Cali: We haven't sued anyone on the basis of fraud. We have sued grant recipients on the basis of ineligibility, that they got funds that they were not eligible for.

ROA.919.  Cali further confirmed that any such cases "would have come through [SCW]." ROA.920. Thus, contrary to the district court's ruling on the undisputed factual record before it, fraud could *not* have been grounds for Defendants' threat of fee-shifting in their dunning letters to Plaintiffs.

In sum, the district court violated summary judgment rules by introducing a factually-unsupported theory of attorneys'-fee recovery, and by failing to provide notice of its theory. ROA.8525.  Rule 56(f) exists so the parties can inform the court with evidence and argument. Such

notice here could have averted the utterly unfounded and grossly unjust ruling entered by the lower court, which is due to be reversed.

## VI.  The district court erred in dismissing Plaintiffs' fourth claim, relating to Defendants' inducement to revive time-barred claims.

Plaintiffs' second claim addresses how Defendants' letters violate the FDCPA by threatening to sue on time-barred debt. Their fourth claim addresses the additional violation that occurs when a debtor, under ongoing pressure, is induced to make payment and/or sign a promissory note – thereby reviving the expired debt.  The district court's dismissal of Plaintiffs' fourth claim hinged on its determinations made in the dismissal of their second claim, specifically which limitations period applies and when it commences to run.  ROA.8525-26.  So, if this Court reverses *either* of these rulings on the second claim, then this Court should also reverse the lower court's dismissal of the fourth claim.

The claim arises from Defendants' Fall 2017 communications to Mrs. Randolph which provoked her signing a promissory note and making payment. These communications, although subsequent to Defendants' dunning letter, are likewise subject to FDCPA requirements because their "animating purpose" was "to induce payment." *Flinn v.*

*Michael J. Scott, P.C.*, No. 14-0701, 2014 WL 11460395, at *3 (N.D. Tex. Dec. 12, 2014), quoting *Grden v. Leiken Ingber & Winters, PC*, 643 F.3d 169, 173 (6th Cir. 2011). *Grden* further explained that §1692e makes clear that "a communication need not itself be a collection attempt; it need only be connected with one." 643 F.3d at 173.

Pertinently, this Court recognizes that communications regarding time-barred debt are especially critical because "consumers may unwittingly reset the limitations period." *Manuel,* 956 F.3d at 830, citing *McMahon*, 744 F.3d 1010. Indeed, the Federal Trade Commission is concerned about deception by omission because "consumers often do not know that in many states the making of a partial payment on a stale debt actually revives the entire debt even if it was otherwise time-barred." *Id.* at 1015. Ultimately, courts are concerned for "the well-meaning consumer" who may "inadvertently dig herself into an even deeper hole." *Baye v. Midland Credit Mgmt., Inc.*, No. 17-4789, 2017 WL 4918998, at *10 (E.D. La. Oct. 31, 2017) (recognizing that failure to disclose the consequence of making payment on, or promising to pay, a time-barred debt could constitute an FDCPA violation).

This is exactly how Defendants' continuing communications with Mrs. Randolph violated the FDCPA. The undisputed facts of record show that State Farm had notified the State by October 18, 2007 (ROA.6953-56) – and probably earlier (ROA.7820) – of its payment to Mrs. Randolph. It is also undisputed that Defendants sent their collection letter to Mrs. Randolph on August 3, 2017. ROA.7025. However, Defendants' collection efforts against Mrs. Randolph did not end there.[38]  They had further contact with her in September 2017, which culminated in her signing a promissory note and making her first payment on the alleged debt on October 24, 2017 (ROA.7034-43) – more than ten years after the State received notice of the potentially duplicative payment.

If this Court applies the six-year statute of limitations of 28 U.S.C. § 2415 or the five-year prescriptive period of Louisiana Civil Code Article 1564 to these alleged debts, then all of Defendants' actions plainly violate the FDCPA as impermissible threats and misrepresentations regarding

---

[38] In fact, they should not have started there either.  Defendants' direct communications with Mrs. Randolph violated the Louisiana Rules of Professional Conduct because she was represented by counsel, a fact that Defendants' principal, OCD, was already on notice of and had reportedly flagged in their file. Nonetheless, despite access to that file, Defendants wrote *directly* to the unsophisticated Mrs. Randolph, who without the benefit of counsel, was cowed into reviving the prescribed debt. The impact of Defendants' FDCPA violations was exacerbated by their coming between Mrs. Randolph and her counsel.

time-barred debt. In addition, even if the lower court's choice of the ten-year period of Article 3499 holds, Plaintiffs submit that the period commenced to run upon the State's *receipt* of notice (by October 18, 2007) rather than when the State *reviewed* that notice (March 2008). If this Court agrees, Defendants' conduct in accepting payment that revived the expired prescriptive period of ten years violated the FDCPA.

In sum, if either aspect of the district court's rulings on the statute of limitations issue is reversed or modified, then its ruling on Plaintiffs' fourth claim is due to be reversed. In that event, Plaintiff Randolph submits that the record establishes that she is entitled to summary judgment on this claim.

## VII. Class certification should be granted.

This Court exercises *de novo* review to determine whether the district court applied the correct legal standard to class certification decisions, including standing, which is a question of law. *In re Deepwater Horizon*, 739 F.3d 790, 798 (5th Cir. 2014).

Here, the district court ruled that each of Plaintiffs' four claims failed and therefore they could not represent members of the class because, "where each of Plaintiffs' claims fails, so too does the class."

ROA.8526.  Denial of class certification was based solely on the dismissal of Plaintiffs' individual claims; the district court found no other defect to either Plaintiff's standing, and the district court did not reach the merits of class certification under Rule 23.

Thus, if this Court finds that Plaintiffs have proved any of their claims, this impediment to class representation is resolved and the district court's denial of class certification should be vacated.  *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 884 (5th Cir. 2000).  In that event, Plaintiffs pray that this Court certify the proposed class and subclasses based on the record, or alternatively remand to allow consideration of their class allegations.

[REMAINDER OF THIS PAGE INTENTIONALLY BLANK]

## CONCLUSION AND RELIEF REQUESTED

WHEREFORE, for the foregoing reasons, and because the parties and the district court agreed that all of the contested issues at bar may be decided as a matter of law on the undisputed factual record, Plaintiffs pray that this Honorable Court: (1) reverse summary judgment granted in favor of Defendants; and (2) render judgment in favor of Plaintiffs by granting their motions for summary judgment on the issue of liability for each of their four FDCPA claims; (3) vacate denial of Plaintiffs' motion for class certification and enter judgment certifying the proposed class and subclasses, or alternatively remand for consideration by the district court; and (4) remand this case to the district court with instruction to proceed to trial on damages.

Plaintiffs further pray for all other legal and equitable relief that this Court may fashion.

[SIGNATURE BLOCK ON FOLLOWING PAGE]

**Respectfully Submitted,**

*s/ Margaret E. Woodward*

_____

Margaret E. Woodward (La. 13677)
1229 N. Tonti Street
New Orleans, Louisiana 70119
Tel: (504) 301-4333
Fax: (504) 301-4365
mewno@aol.com
*APPEAL COUNSEL*

GESUND & PAILET, LLC
Keren E. Gesund (La. 34397)
3421 N. Causeway Blvd.
Suite 805
Metairie, Louisiana 70002
Tel: (702) 300-1180
Fax: (504) 265-9492
keren@gp-nola.com

O. Randolph Bragg (Ill. 6221983)
300 N. State Street
Suite 5320
Chicago, Illinois 60654
Tel: (708) 774-4022
randbragg1@gmail.com

Jennifer C. Deasy (La. 31696)
JENNIFER C. DEASY, LLC
1100 Poydras Street, Suite 1500
New Orleans, Louisiana 70163
Tel: (504) 582-2300
Fax: (504) 582-2310
jd@jenniferdeasy.com

SOUTHERN POVERTY LAW CENTER
Kirsten Anderson (Fla. 17179)
kirsten.anderson@splcenter.org
Tel: (334) 414-0760
Jamie Rush (Ga. 999887)
jamie.rush@splcenter.org
Tel: (404) 673-6523
Clara Potter (La.38377)
clara.potter@splcenter.org
Tel: (504) 352-2060
400 Washington Avenue
Montgomery, Alabama 36104
and
201 Saint Charles Avenue
New Orleans, Louisiana 70170

*Counsel for Plaintiffs-Appellants,*
*Iris Calogero and Margie Nell Randolph*

**CERTIFICATE OF FILING AND SERVICE**

I, Margaret E. Woodward, hereby certify that on January 3, 2023, I electronically filed the foregoing brief using the Court's ECF system. Opposing counsel has therefore been served pursuant to Fifth Circuit Rule 25.2.5.

s/ *Margaret E. Woodward*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B), as enlarged by this Court's Order issued November 30, 2022, because it contains 19,974 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by FED. R. APP. P. 32(f) and Fifth Circuit Rule 32.2.

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point font named Century Schoolbook.

*s/ Margaret E. Woodward*

# ADDENDUM

## I. Fair Debt Collection Practices Act (FDCPA)

**15 U.S.C. § 1692e** provides in pertinent part:

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

\* \* \*

(2) The false representation of—

(A)   the character, amount, or legal status of any debt;

(B)   any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.

\* \* \*

(5) The threat to take any action that cannot legally be taken or that is not intended to be taken.

\* \* \*

(10) The use of any false representation or deceptive means to collect or attempt to collect any debt. . .

**15 U.S.C. § 1692f** provides in pertinent part:

A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt.

(1)   The collection of any amount (including interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

**15 U.S.C. § 1692g** provides in pertinent part:

> Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall ... send the consumer a written notice containing—
>
> (1) the amount of the debt[.]

## II.   THE STAFFORD ACT

42 U.S.C. § 5155:

> (a)   A person receiving Federal assistance for a major disaster or emergency shall be liable to the United States to the extent that such assistance duplicates benefits available to the person for the same purpose from another source.
>
> ***
>
> (c) The agency which provided the duplicative assistance shall collect such duplicative assistance from the recipient in accordance with chapter 37 of title 31, relating to debt collection, when the head of such agency considers it to be in the best interest of the Federal Government.

## III.  Statutes of Limitation

### A.    Federal

28 U.S.C. § 2415, *Time for commencing actions brought by the United States*

(a) Subject to the provisions of section 2416 of this title, and except as otherwise provided by Congress, **every action for money damages brought by the United States or an officer or agency thereof which is founded upon any contract express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action accrues or within one year after final decisions have been rendered in applicable administrative proceedings required by contract or by law**, whichever is later: Provided, That in the event of later partial payment or written acknowledgment of debt, the right of action shall be deemed to accrue again at the time of each such payment or acknowledgment: Provided further, That an action for money damages brought by the United States for or on behalf of a recognized tribe, band or group of American Indians shall not be barred unless the complaint is filed more than six years and ninety days after the right of action accrued: Provided further, That an action for money damages which accrued on the date of enactment of this Act in accordance with subsection (g) brought by the United States for or on behalf of a recognized tribe, band, or group of American Indians, or on behalf of an individual Indian whose land is held in trust or restricted status, shall not be barred unless the complaint is filed sixty days after the date of publication of the list required by section 4(c) of the Indian Claims Limitation Act of 1982: Provided, That, for those claims that are on either of the two lists published pursuant to the Indian Claims Limitation Act of 1982, any right of action shall be barred unless the complaint is filed within (1) one year after the Secretary of the Interior has published in the Federal Register a notice rejecting such claim or (2) three years after the date the Secretary of the Interior has submitted legislation or legislative report to Congress to resolve such claim or more than two years

after a final decision has been rendered in applicable administrative proceedings required by contract or by law, whichever is later.

(emphasis supplied).

## B.    Louisiana

La. Civ. Code Ann. art. 3499, *Personal action*:

Unless otherwise provided by legislation, a personal action is subject to a liberative prescription of ten years.

La. Civ. Code Ann. art. 1564, *Dissolution for non-execution of other condition; prescription*

An action to dissolve a donation for failure to fulfill the conditions or perform the charges imposed on the donee prescribes in five years, commencing the day the donee fails to perform the charges or fulfill his obligation or ceases to do so.

## C.    Other states' limitation periods for breach of contract

**Alabama – 6 years**, Ala. Code § 6-2-34 (4), (5), (9):

The following must be commenced within six years:

> \* \* \*
>
> (4) Actions founded on promises in writing not under seal;
>
> (5) Actions for the recovery of money upon a loan, upon a stated or liquidated account or for arrears of rent due upon a parol demise;
>
> \* \* \*

and

(9) Actions upon any simple contract or speciality not specifically enumerated in this section.

**Florida – 5 years,** Fla. Stat. Ann. § 95.011 (2)(b):

Actions other than for recovery of real property shall be commenced as follows:

\* \* \*

(2) Within five years.--

\* \* \*

(b) A legal or equitable action on a contract, obligation, or liability founded on a written instrument. . .

**Georgia – 6 years,** Ga. Code Ann. § 9-3-24:

All actions upon simple contracts in writing shall be brought within six years after the same become due and payable....

**Mississippi – 3 years**, Miss. Code Ann. § 15-1-49:

(1) All actions for which no other period of limitation is prescribed shall be commenced within three (3) years next after the cause of such action accrued, and not after.

**Texas – 4 years**, Tex. Civ. Prac. & Rem. Code § 16.004:

(a) A person must bring suit on the following actions not later than four years after the day the cause of action accrues:

(1) specific performance of a contract for the conveyance of real property;

(2) penalty or damages on the penal clause of a bond to convey real property;

(3) debt;

(4) fraud; or

(5) breach of fiduciary duty.